**FRAMLAU CORPORATION**

v.

**The UNITED STATES.**

No. 274–74.

United States Court of Claims.

Dec. 14, 1977.

D. Joe Smith, Jr., Washington, D. C., for plaintiff; Gilbert A. Cuneo, Washington, D. C., Atty. of record; C. Stanley Dees, Sellers, Conner & Cuneo, Washington, D. C., of counsel.

Richard J. Webber, Washington, D. C., with whom was Asst. Atty. Gen. Barbara Allen Babcock, Washington, D. C., for defendant.

Before LARAMORE, Senior Judge, and KUNZIG and BENNETT, Judges.

## ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

BENNETT, Judge:

This case, arising under the Wunderlich Act, 41 U.S.C. §§ 321, 322 (1970), is before the court on plaintiff's appeal from a decision entered by Trial Judge Francis C. Browne, allowing defendant's cross-motion for summary judgment. Plaintiff does not request review of seven counts of its petition disposed of by the trial judge. What remains for our attention are counts III, VIII, X, and XI of plaintiff's petition and plaintiff's motion for summary judgment as it relates to those counts.[1] We reach the same result as the trial judge but by a somewhat different and shorter route.

Numerous issues were decided adversely to plaintiff by the contracting officer, by the Armed Services Board of Contract Appeals (ASBCA, or the board), and by the trial judge. Of the four remaining issues still contested by plaintiff, the first is of prime importance since it affects the outcome of each of the others. This dispute, which the parties have come to call the floor-and-girder issue, was resolved by the trial judge in favor of defendant. We agree with his able analysis, much of which has been included in the following discussion.

---

[1] The counts of the petition before the court, and the board citations to the issues still controverted, are:

Count III. Floor-and-girder issue. ASBCA No. 13893, 71–1 BCA ¶ 8836.
Count VIII. Delay costs and liquidated damages. ASBCA No. 14666, 72–1 BCA ¶ 9279.
Count X. Financing charges. ASBCA No. 14666, 72–1 BCA ¶ 9279.
Count XI. Heating costs. ASBCA No. 14568, 72–1 BCA ¶ 9280.

On June 29, 1967, plaintiff contracted with the Navy to build a Naval Reserve Training Center near Wilkes-Barre, Pennsylvania. Construction was to begin on the date of the contract and to be completed by June 26, 1968, with liquidated damages of $200 per day thereafter.[2] Plaintiff's delay in posting required payment and performance bonds prevented the commencement of work until July 18, 1967. Soon thereafter, a 40-day strike retarded plaintiff's progress further. For these and other reasons, little more than half the work was completed by the onset of the severe 1967–68 winter, and construction was not completed until sometime in 1969. One factor bearing on the pace of performance was the Government's decision concerning the method of constructing the upper floors of the building, giving rise to the dispute aforementioned as central to this case.

The contract authorized a choice by the contractor between three methods of constructing the second and third floors. The alternatives permitted were precast, cast-in-place, and combination flooring. The first two methods of construction were described in drawings which were part of the contract; the third was not. The contract's key references to combination floor construction were in section 3C.3.1 of the specifications, which provided, inter alia :

> General. A combination floor system may be provided at the option of the Contractor in lieu of the precast and cast-in-place floor construction. The combination floor system shall consist of a joist and filler system providing monolithic floor construction integral with supporting beams and columns. * * * All work and materials shall be in accordance with the applicable requirements of specification 13Y except as modified herein.

The language most hotly debated in this case is to be found in the phrase "providing monolithic floor construction integral with supporting beams and columns," although in the view we take of the dispute, the language incorporating specification 13Y is also critical. We begin by examining the meaning of the terms "monolithic" and "integral."

The parties accept as authoritative the definitions of the Concrete Reinforcing Steel Institute (CRSI),[3] which defines the terms relevant to this dispute as follows:

> INTEGRAL—Elements which act together as a unit, such as concrete joists and top slab. Concrete members may be made integral by bond, dowels, or being cast in one piece

> MONOLITHIC—Strictly interpreted, is concrete cast in one operation. Monolithic concrete elements may be designed to act integrally, or as separate elements if articulated by weakened plane contraction joints. See Integrally-cast.[4]

Although plaintiff initially planned to use precast panel floors, after award it changed plans and elected to use the combination floor system for construction of the upper floors, selecting the "Omnia" system which was commercially available from Nyce-Crete Company. In September 1967 plaintiff submitted drawings illustrating the latter as its proposed construction method. The drawings showed that plaintiff would not be casting the floors and beams (also known as girders)[5] monolithically but instead would use a construction joint[6] to make them integral. Under this method plaintiff would be monolithically casting

---

**2.** Clause 3 of the contract's general provisions was the standard changes clause, and clause 6 was the standard disputes clause.

**3.** CRSI Recommended Practice for Placing Reinforcing Bars—Including 1963 Supplement (1963) (hereinafter CRSI Handbook) at 274, 276.

**4.** "INTEGRALLY-CAST–Elements (such as concrete joists and top slab) cast in one piece. See Monolithic." Id. at 274.

**5.** "BEAM—Horizontal support or member carrying transverse loads." "GIRDER—Principal beam supporting other beams." Id. at 270, 273. The terms are used interchangeably in this opinion.

**6.** "CONSTRUCTION JOINT—Separation between two placements of concrete; a means for keying two sections together." Id. at 271.

the floor, permitting it to harden, and then casting the concrete for the girders. The advantage would be that plaintiff would not need hanging forms because the forms for the girders could be set upon and supported by the floor. The drawings were approved by defendant in mid-September.

In October, however, defendant revoked its earlier approval of the drawings,[7] claiming the use of construction joints was impermissible under the contract and insisting that monolithic construction of the floors and girders was required. The Government insisted that the floor and girders be formed in a single pour, or two pours completed before either could cure,[8] believing that only monolithic construction could provide the strength necessary to ensure the soundness of the building.

Under protest, Framlau complied and constructed the floors and girders monolithically. It then sought an equitable adjustment for the increased cost of complying with the Government's instructions. The contracting officer, the board, and the trial judge all concluded that the Government's insistence on a monolithic construction method was allowed under the contract. We agree.

We have noted that section 3C.3.1 incorporated by reference specification 13Y of the Bureau of Yards and Docks specifications. We should add that section 3C.2, also applicable only to combination floor construction, also mentioned the Bureau of Yards and Docks specifications, specifically incorporating by reference specification 13Y*g* thereof. The parties have stipulated that the referenced specification provides that "construction joints can only be placed

or used where approved or where shown." The other important specification is in the general notes on sheet 33 of the contract documents (entitled Column Schedule & Details Structural), which provides in section 3A: "Unless otherwise indicated all construction shall be monolithic."

Plaintiff's construction of the phrase "monolithic floor construction integral with supporting beams and columns" emphasizes the word "integral." Plaintiff uses the definition cited earlier to support its contention that the contract permitted plaintiff to employ any method, including the use of construction joints, which would achieve integration. Framlau contends that defendant knew how to specify that the flooring and girders be monolithic but instead chose to require only that they be integral, leaving the requirement of monolithic construction to apply to the floor construction alone. Plaintiff argues that defendant was obligated to approve any construction method achieving integration (a result which the *CRSI Handbook* indicates could be reached with construction joints) and that defendant could not properly insist on wholly monolithic construction. Framlau invokes our rule in *WPC Enterprises, Inc. v. United States*, 323 F.2d 874, 876, 163 Ct.Cl. 1, 6 (1963), which would permit plaintiff to adopt any reasonable construction of an ambiguous contract provision.[9] If, as plaintiff argues, the Omnia plan was permissible under the contract, Framlau would be entitled to an equitable adjustment for the change instituted by defendant's insistence upon wholly monolithic construction.

Defendant responds that, while plaintiff may be entitled to call upon reasonable

---

7. Plaintiff has not contended that it was prejudiced by the Government's approval and subsequent revocation of that approval of plaintiff's proposed construction plans. Framlau's claim is based upon the Government's allegedly wrongful insistence on monolithic construction, and no claim was made that plaintiff was damaged by the Government's delay in detecting the construction joints in plaintiff's combination floor construction proposal.

8. This latter method would achieve the same result under principles of concrete chemistry.

The two pours would have to be within mere hours of each other.

9. *WPC Enterprises, Inc.* was disapproved on other grounds in *United States v. Anthony Grace & Sons*, 384 U.S. 424, 430 n. 6, 86 S.Ct. 1539, 16 L.Ed.2d 662 (1966), but the proposition for which the case is cited in this opinion is still sound law.

This standard rule of contract interpretation has been stated in many of our cases and is embodied in the Restatement (Second) of Contracts § 232 (Tent.Draft No. 5, 1970).

interpretations of contractual ambiguities, no such ambiguity exists here. That "integral with" has several possible meanings is conceded, but defendant finds two contract provisions to eliminate any ambiguity. When the contract is read as a whole, as defendant insists it must be, it admits of only one construction: that integration was to be achieved through monolithic construction. The two provisions central to this argument are, first, sheet 33, which prohibits the use of construction joints except where approved or where shown, and, second, specification 13Y, which directs that all construction be monolithic unless otherwise provided.

Plaintiff's attempts to escape the effect of these two provisions are well argued and vigorously pressed but also unavailing. We next discuss, in turn, plaintiff's answer to sheet 33's general notes and then its argument concerning specification 13Yg, incorporated by reference.

■■■ To defendant's invocation of the general notes on sheet 33, plaintiff responds that they only apply to those subjects covered by that sheet's title: Column Schedule and Details Structural. To plaintiff, this title means the general notes only apply to columns and not to the combination floor. But these notes unmistakably indicate applicability to subjects other than columns. For example, paragraph 3B of the notes refers to precast units and combination systems, although all columns were to be cast in place. Other subjects covered in the notes, such as structural steel, open web joists, and slabs on grades exposed to weather, also are irrelevant to column construction. The testimony by defendant's witness that the general notes on sheet 33 applied to the contract as a whole was undisputed and compelling.[10] If any further reason were needed, we might add that

the title itself goes beyond columns by mentioning "Details Structural." Therefore, we conclude that the combination flooring system was subject to the contract term, "Unless otherwise indicated all construction shall be monolithic."

■■■ Plaintiff next contends that the word "integral" otherwise indicates. We disagree. "Integral" indicates that integration is required but it does not foreclose inquiry into *how* it is to be achieved. We do not read it to authorize every method of construction which results in integration but rather interpret it as mandating integration in a manner otherwise permissible under the contract. The contract provision requiring monolithic construction "unless otherwise indicated" requires a more explicit authorization of nonmonolithic construction than is shown here before we will find that provision inapplicable.

This analysis is particularly forceful when applied to the provision barring construction joints except "where approved or where shown." Since there is no contention that the construction joints plaintiff wished to use were shown in contract drawings, plaintiff is left with no alternative but to argue that they were "approved." The approval, plaintiff contends, must be found in the choice of the word "integral" over the word "monolithic." But integral may mean monolithic,[11] and integral construction can be achieved without construction joints. No contract provision expressly approved the use of construction joints, and we believe specification 13Yg's requirement of approval of construction joints cannot be met by showing the use of a word which, standing alone, might contemplate their use but by no means requires it. In other words, a more affirmative act of approval

**10.** The trial judge used this undisputed testimony as the basis for a *finding of fact* that paragraph 3 pertains to the entire building process, including the floor-and-girder construction. Trial judge's opin. at 40 n.23. But we treat this factual evidence, unchallenged by plaintiff, as warranting the *conclusion of law* that para-

graph 3 has general applicability. That interpretation of a contract is an issue of law is well settled. *See, e. g., C. J. Langenfelder & Son v. United States,* 341 F.2d 600, 609, 169 Ct.Cl. 465, 480 (1965).

**11.** See text relating to note 3, *supra.*

was contemplated before construction joints could become permissible.[12]

Plaintiff tries to avoid this reasoning by contending that specification 13Y is general while the "integral with" phrase is specific. If true, this fact would permit plaintiff to avail itself of the rule that specific contract provisions override general ones to the contrary. *United Pac. Ins. Co. v. United States*, 497 F.2d 1402, 1406, 204 Ct.Cl. 686, 694 (1974); *Hol-Gar Mfg. Corp. v. United States*, 351 F.2d 972, 980, 169 Ct.Cl. 384, 396 (1965). But two sound reasons prevent that rule's application here. First, there need be no conflict between the "general" provisions and the specific one if defendant's construction is adopted. Here, the disputed provision is admittedly ambiguous when read by itself. But the two provisions relied on by defendant eliminate any ambiguity in the word "integral." Where a contract read as a whole is amenable to only one reasonable construction, we have no need for application of rules for the resolution of ambiguities against the drafter. *Martin Lane Co. v. United States*, 432 F.2d 1013, 1021, 193 Ct.Cl. 203, 218 (1970); *Bishop Eng. Co. v. United States*, 180 Ct.Cl. 411, 415–16 (1967); *Construction Serv. Co. v. United States*, 357 F.2d 973, 975, 174 Ct.Cl. 756, 760 (1966).

Second, specification 13Y is not a general provision dredged up from some obscure corner of the contract. To the contrary, it is *specifically* cited and incorporated by reference in the very paragraph which authorized the combination floor system. On the same page, specification 13Y*g* is again invoked to establish standards for concrete construction of the combination floor system. These facts convince us that no ambiguity exists and that defendant's interpretation is the only reasonable one when the contract is read as a whole.

Finally, plaintiff makes much of the fact that columns were subject to the same con-tract provision as supporting beams. That is, the contract required "monolithic floor construction integral with" the vertical members, whether beams or columns. Yet, plaintiff observes, defendant permitted the use of construction joints in regard to *columns* and did not require monolithic construction of columns and floors. Therefore, plaintiff argues, defendant's own interpretation shows the *beams* did not have to be constructed monolithically with the floor.

Defendant's answer at oral argument shows this argument to be fallacious. All columns were shown on contract diagrams as having construction joints. The authority to make the columns integral, but not monolithic, with upper-story flooring came not from the contractual provision relied on by plaintiff but from the *drawings* which specifically authorized the use of construction joints with columns. Indeed, one could not readily make the columns monolithic with the flooring and beams, since even more extensive use of hanging forms would be necessary; virtually the entire structure of the building would have to be poured, all at once, from the top. Quite reasonably, the contract drawings expressly indicated that columns could be poured first and that construction joints could be used to achieve integration of columns, but not beams, with upper-story flooring.

With respect to *columns*, both the requirement of monolithic construction and the prohibition against construction joints were expressly made inapplicable. Nothing that plaintiff can point to warrants the same conclusion concerning *beams*. With respect to the latter, there was less need and no authorization to use construction joints or to permit nonmonolithic construction.

■ An additional ground for denying plaintiff's claim is plaintiff's lack of reliance on its claimed interpretation of the

12. We acknowledge that the language requiring approval is not as unequivocal as that found in *WRB Corp. v. United States*, 183 Ct.Cl. 409, 480–83 (1968), where the contract said: "No construction joints will be allowed in buildings, except with special permission of the contracting officer." Nonetheless, we believe the language here was sufficiently clear to warrant the same result, *i. e.*, a finding that the contract did not permit the use of construction joints.

contract provision. It is well settled that where a contractor contends for his interpretation of an alleged ambiguous contract, he must show that he relied on such an interpretation. *Dale Ingram, Inc. v. United States,* 475 F.2d 1177, 1185, 201 Ct.Cl. 56, 72 (1973), and cases there cited. But plaintiff has not, and cannot, show that it relied on its interpretation of the phrase concerning monolithic floor construction. Surely it did not rely on such an interpretation when making its bid. The board found that at the time of bid preparation plaintiff was planning to use precast construction, not combination construction, and plaintiff did not rely on the interpretation during performance, for plaintiff was informed in October of 1968 that wholly monolithic construction was required.[13] Plaintiff chose not to return to its plan to construct the floors according to the precast method upon which it based its bid.

The foregoing analysis leaves us with no doubt that defendant acted within its rights under the contract when it insisted upon monolithic construction of the floors and girders on upper floors. Therefore, plaintiff was entitled to no equitable adjustment for being denied permission to construct the upper floors according to the Omnia construction plan. On this point, the board's decision is factually sustainable and legally correct.

Plaintiff's next claim is for delay costs and remission of liquidated damages. Of the numerous delays claimed in board proceedings only one 12-day claim is before the court.[14] Plaintiff spent 12 days in the spring of 1968 on site restoration, repairing damage caused by the heavy winter. Some of this period was spent repairing hanging forms which would not have been used if plaintiff's proposed construction method

had been permitted.[15] Plaintiff contends that defendant is chargeable with the delays, alleging that the failure to be under roof by winter was due to defendant's insistence on wholly monolithic floor-and-girder construction.

Plaintiff, at argument, conceded that its entitlement to additional delay damages and to remission of liquidated damages for this period is dependent upon its success concerning the floor-and-girder dispute. Since we find for defendant upon that issue, this one requires no further discussion.

Plaintiff also seeks compensation for heating costs incurred during the second winter of construction. This claim is likewise dependent upon the first issue concerning the floor and girders. No heating costs were incurred until more than 2 months *after* the termination date of the constructive completion schedule created to allow for all extensions due under adjustments awarded by the board. Not having prevailed on its floor-and-girder claim, plaintiff cannot possibly extend the constructive completion schedule up to the time when heating costs were first incurred. Therefore, this claim, like the delay cost and liquidated damage claim, must fall with the floor-and-girder argument.

Plaintiff's last claim is for interest on borrowings. Although the size of this claim is affected by the outcome of the floor-and-girder dispute, the fragmented nature of this claim requires separate treatment of component elements. Plaintiff's interest claim results from late payment and the withholding of liquidated damages (some of which were later returned) in addition to awards for changed work and overhead costs. These will be taken up in turn.

13. See footnote 7, *supra.*

14. Plaintiff has told the court that its second, third and fourth appeals here are not separate claims for relief based on distinct "changes" but rather were brought to preserve any rights plaintiff may have had to a complete equitable adjustment for damages resulting from the Government's insistence on monolithic floor-and-girder construction.

15. Defendant contends that its authorization to plaintiff to cast the floors and girders with two pours within hours of each other made the use of hanging forms unnecessary, a contention with which plaintiff disagrees. Since we find that the contract permitted defendant's insistence upon monolithic construction, this issue becomes immaterial.

■ Plaintiff's argument claiming entitlement to interest for delays in payment and for the wrongful withholding of liquidated damages asks that we award plaintiff interest under circumstances in which we have not previously done so. *Bell v. United States*, 404 F.2d 975, 984, 186 Ct.Cl. 189, 206 (1968), said that the board could award interest as part of an equitable adjustment for changed work where a contractor actually paid the interest because of the Government's delay in payment. But we have never extended *Bell* to allow the recovery of interest on liquidated damages withheld and later returned or for late payments by the United States. *See Mar-Pak Corp. v. United States*, 203 Ct.Cl. 718, 720 (1973). Our reason for restricting the scope of interest recovery is the bar erected by 28 U.S.C. § 2516(a) (1970), which denies this court power to award interest except where allowed by contract or where authorized by statute. Since plaintiff here has the benefit neither of a contract nor a statute providing for the recovery of interest, no interest can or will be awarded.[16]

Plaintiff also asks that we order the board to award interest on the $745.17 which the board awarded to plaintiff for changed work. Under *Bell, supra*, an equitable adjustment could have included such an amount if plaintiff could have proved it was forced to borrow to perform the changed work. But the board found that plaintiff failed to prove what part, if any,[17] of its large borrowings were attributable to compensable changes. This failure deprived plaintiff of the opportunity to recover any interest. For this reason, we affirm the board's denial of interest on changed work.

■ Similar reasoning undermines plaintiff's claim for interest based on increased overhead costs awarded by the board to plaintiff in the amount of $3,500. Again, the board's denial of interest was premised on its finding that plaintiff failed to segregate recoverable amounts from borrowings attributable to extraneous, or noncompensable, matters. Plaintiff's interest claim was brought to the board as part of its delay claim, which was presented to the board on a total time basis.[18] Plaintiff did not prove which delays or which borrowings were properly attributable to the Government. For this reason, substantial evidence supports the board's conclusion that entitlement to interest was not proved.

■ Since the board's denial of interest on overhead and changes expenses was based on plaintiff's failure of proof concerning plaintiff's borrowing,[19] plaintiff urges that we abandon the *Bell* standard and follow the board's recent cases[20] allowing recovery of interest without regard to whether debt or equity capital is used. This we are not prepared to do. It may be

16. The harshness of the statutory mandate appears to have been eased as to contracts entered into on or after Oct. 12, 1972. On that date, the Armed Services Procurement Regulations (ASPRs) were amended to authorize the payment of interest on claims arising under a contract from the time of the contractor's appeal to the contracting officer until the final judgment of a court of competent jurisdiction. 32 C.F.R. §§ 1–333, 7–104.82 (1975); *cf.* 41 C.F.R. § 1–1.322 (1976). Such departmental regulations are treated by this court as law governing the interpretation of Government contracts. *Hills Transp. Co. v. United States*, 492 F.2d 1394, 1396–97, 204 Ct.Cl. 51, 55 (1974). In contrast to that case, however, this one presents a regulation which is *prospective* only; since it was inapplicable to contracts existing before but amended after the regulation's promulgation, 32 C.F.R. E–621(4) (1975), *a fortiori* the regulation cannot apply to un-amended contracts existing before Oct. 12, 1972.

17. As the Government points out, it is doubtful that plaintiff could show any borrowing was necessitated by such a small increase in contract costs as was here approved for changes.

18. Such presentations are ill favored as a method of proving damages. *Law v. United States*, 195 Ct.Cl. 370, 382 (1971); *WRB Corp. v. United States, supra*, 183 Ct.Cl. at 427.

19. For the trial judge, the important factor was the insignificant amount of interest which would have been involved.

20. *Fischbach & Moore Int'l Corp.*, ASBCA No. 18146, 77–1 BCA ¶ 12,300; *New York Shipbuilding Co.*, ASBCA No. 16164, 76–2 BCA ¶ 11,979; *Ingalls Shipbuilding Div., Litton Sys., Inc.*, ASBCA No. 17717, 76–1 BCA ¶ 11,851.

argued that differing treatment of debt and equity capital follows an artificial distinction and that it rewards thin capitalization, but we are constrained by the statute discussed earlier and further believe that the distinction is supported by reason in that the costs to the contractor of borrowing capital is clearly determinable, while the value to him of the use of equity capital is not so readily ascertainable.

We thus conclude that the denial of interest was correct.

For the foregoing reasons, we find that the board and the trial judge were correct in determining that the contractor is not entitled to recover on any of its claims. Plaintiff's motion for summary judgment is denied, defendant's cross-motion for summary judgment is granted, and plaintiff's petition is dismissed.

