**DRAVO CORPORATION**

v.

**The UNITED STATES.**

No. 315–77.

United States Court of Claims.

Feb. 21, 1979.

Gerald DeGarmo, Seattle, Wash., attorney of record, for plaintiff. Oles, Morrison, Rinker, Stanislaw & Ashbaugh, Seattle, Wash., of counsel.

Edward J. Friedlander, Washington, D. C., with whom was Asst. Atty. Gen. Barbara Allen Babcock, Washington, D. C., for defendant. Frank M. Rapoport, Washington, D. C., of counsel.

Before DAVIS, KASHIWA and KUNZIG, Judges.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS–MOTION FOR SUMMARY JUDGMENT

PER CURIAM:

This case comes before the court on plaintiff's request, filed August 28, 1978, for review by the court of the recommended decision of Trial Judge Robert J. Yock, filed August 3, 1978, pursuant to Rule 166(c), on plaintiff's motion and defendant's cross-motion for summary judgment, having been submitted to the court on the briefs and oral argument of counsel. Upon consideration thereof, since the court agrees with the trial judge's recommended decision, as hereinafter set forth, it hereby affirms and adopts the decision as the basis for its judgment in this case. With respect to the issue discussed in Part III of the trial judge's opinion, the panel points out that, under the uniform practice of the court, this panel is bound by the recent decision by another panel in *Framlau Corp. v. United States,*

568 F.2d 687, 693–95, 215 Ct.Cl. 185, 196–99 (1977), and could not overrule or disregard it, even if we had the disposition to do so; only the court *en banc* can do that. Accordingly, plaintiff's motion for summary judgment is denied, defendant's cross-motion for summary judgment is granted and the petition is dismissed.

## OPINION OF TRIAL JUDGE

YOCK, Trial Judge: This contract case involves an appeal from a decision of the Department of the Army, Corps of Engineers Board of Contract Appeals (hereinafter the Board).[1] That decision affirmed the contracting officer's denial of plaintiff's interest claim in the sum of $377,488.81. On cross-motions for summary judgment, the parties seek review of the Board's decision in accordance with the standards of the Wunderlich Act, 41 U.S.C. §§ 321, 322 (1970).

For reasons outlined herein, the Board's decision is affirmed.

### Facts

Plaintiff is a corporation with general offices at Pittsburgh, Pennsylvania. It describes itself as a diversified enterprise with worldwide operations. It is involved with markets including power generation, water management, water transportation, rapid transit, pollution control, urban development, bulk materials handling, minerals and metals processing, and mining. The company's activities are organized into four operating groups within which are more than 25 separate business divisions. This contract claim concerns a project which was under the control of the Western Construction Division of the Heavy Construction Group of plaintiff corporation.

On August 1, 1969, plaintiff entered into contract No. DACW67–70–C–0005 with the United States Army Corps of Engineers for the purpose of constructing the Wynoochee Dam, Facilities for Upstream Fish Passage and Roads on the Wynoochee River in the State of Washington. The contract work

---

1. *Dravo Corporation*, ENG BCA No. 3731, 77–1 BCA ¶ 12,533.

was completed and accepted on October 20, 1972. During contract performance, between May 1970 and June 1972, Dravo performed the following work:

| A). Case No. 32b – | Revision of height of lift differentials between mono-liths of the Dam | Modification No. 37 |
| B). Case No. 14b – | Removal of unsafe rock on the right abutment of the Dam | Modification No. 37 |
| C). Case No. 20 – | Change in aggregate specifications to specify allowable amounts of wood particles in the aggregate | Modification No. 38 |
| D). Case No. 20 – | Spillway Choke wall revision | Modification No. 33 |
| E). Case No. 11 – | Pourback Cave Area-Impact | Modification No. 34 |
| F). Case No. 14 – | Right Bank Layback-Direct Cost | Modification No. 35 |

Plaintiff presented claims for the above items founded upon the "Changes" and "Suspension of work" clauses of the contract. After several months of negotiating, the Government recognized the validity of these claims. On September 20, 1972, a firm settlement agreement was reached on all of the above items in the total amount of $1,371,624, later corrected for minor errors to $1,371,960. A profit allowance of 10 percent was included in the settlement.

As of December 4, 1972, Modifications 33, 34 and 35 covering items D, E, and F above, had been issued and accepted in the combined total of $123,754. This left a balance of $1,248,206 due plaintiff for the first three items (A, B, and C). There then followed a prolonged period of time during which technical difficulties and inactivity delayed plaintiff's receipt of the remaining agreed amount of $1,248,206.

On October 29, 1974, Modification 37 was tendered to plaintiff in the amount of $968,000 for items A and B, followed by Modification 38 on December 20, 1974, in the amount of $280,206 for item C, which made a combined total of $1,248,206. After signing and accepting those modifications, plaintiff transmitted them to the contracting offer by letter of December 23, 1974. That letter made the following specific reservation:

By our signatures on Modifications No. P00037 and No. P00038 and Consent of our Sureties thereto, we do not waive, but expressly reserve, the right to claim and receive interest incurred and paid upon the amounts of additional cost and expense occasioned by the recognized "directed changes and suspension of work" from the inception of such directed changes and suspension of work until the date of receipt by us of Modification No. P00037 and Modification No. P00038 recognizing our right to payment for such additional costs and expenses and for which these Modifications are tendered in payment. A separate claim for such interest will be presented in the immediate future.

Plaintiff received payment of the $1,248,206 in accordance with Modifications 37 and 38 on December 24, 1974. That concluded the equitable adjustment settlement with the exception of plaintiff's claim for interest.

Plaintiff calculated its claim for interest in the amount of $377,488.81 in the following manner. Plaintiff began by estimating the costs incurred each month on the Wynoochee Dam project, beginning in August 1970, which were attributable to the changed additional work performed under the contract, and later recognized as valid by contract Modifications 37 and 38. This cost "deficiency" was cumulated to yield a monthly cost "deficiency to date." By June 1972, the last work on the change order had been performed, and the monthly cost deficiency to date, which had reached $1,068,221, remained static until May 1973. At that time, plaintiff added a profit and bond figure of $129,742 to the cost deficiency to date to yield $1,197,963 which was the total remaining deficiency each month until payment was finally received in December 1974. Plaintiff then calculated a monthly "effective rate" of interest on corporate borrowings during the pertinent periods of time, and applied the effective rate to the cost deficiency to date each month to determine the total interest costs.

On January 14, 1975, plaintiff submitted its claim for interest to the contracting officer. This submittal did not mention a claim for imputed interest or additional profit for the use of equity capital but was

restricted to an application at the average rate of interest on corporate borrowings to the estimated monthly costs incurred for Modifications 37 and 38 work. The contracting officer denied the interest claim on November 3, 1975, and plaintiff appealed to the Board, which also denied the claim.

The Board found that plaintiff was a corporation with headquarters at Pittsburgh, Pennsylvania, where it maintained a line of credit with banks and borrowed to finance its operations. The Western Construction Division (Western) was a subordinate organization (division) that was responsible for the management of a number of construction projects including the Wynoochee Dam contract. Except for a small petty cash fund, Western performed no financial transactions. Proceeds generated from the projects under Western's supervision (and other subordinate divisions of plaintiff) were transferred to the headquarters in Pittsburgh. Plaintiff, in turn, was responsible for providing virtually all the funds its subordinate divisions needed to meet current expenses, i. e., payroll, supplies, subcontractor billings, and all other expenses.

The Board further found:

Neither at project, Division, or home office level did appellant maintain any records which would establish that an expenditure for the Modifications Nos. 37 and 38 work was traceable to any specific borrowing made by the Pittsburgh office. The Pittsburgh office did maintain lines of credit with various banks so that it could meet the cash needs of its various activities as they accrued. The reasoning behind appellant's claim is that the level of corporate borrowing would not have remained at the level it did but for the need to meet the costs incurred on account of the Modifications 37 and 38 work. In other words, the concept is theoretical and, although plausible, is not based upon any direct correlation between expenditures at Wynoochee for Modifications 37 and 38 work and the Pittsburgh corporate borrowings.

The Board went on to state that in order for a contractor to recover its interest costs under an equitable adjustment theory, it was required by current law to show a direct correlation or tracing of the interest costs incurred as a result of specific borrowing to meet the increased financial needs of the changed work. In other words, the Board concluded that there would have to be either a direct loan taken out by the contractor to finance the changed work or the necessity to increase existing borrowing arrangements to finance the changed work shown.

In addition, the Board refused to allow an interest recovery based on an imputed interest on equity capital theory, because it was inconsistent with its prior Board decisions and other decided case precedent. Further, the Board reasoned that the matter of profit had not been reserved by the contractor under its settlement agreement, thereby precluding any recovery for additional profit under the equity capital theory. A 10 percent profit factor had been included in the settlement agreement reached by the parties and the only item reserved was the claim for traditional interest on borrowings necessitated by the contract changes. Also, the Board indicated that the plaintiff had presented its case to the Board as a debt capital (borrowing) case and had not attempted to show the matter as an equity capital case.

The Board concluded that the plaintiff's claim must be denied because "unacceptable speculation would be necessary on our part to find that the corporate borrowing record bore a cause and effect relationship to the Modifications 37 and 38 work."

### Discussion

It is the duty of this court to determine whether the Board's findings of fact and conclusions of law are supported by substantial evidence and were correct as a matter of law.

Before responding to the plaintiff's contentions, it is important to point out that judicial review of administrative factual determinations under Wunderlich standards is

narrow and limited. *Koppers Co. v. United States*, 405 F.2d 554, 557, 186 Ct.Cl. 142, 148 (1968). The Board's findings of fact are presumptively correct. *Arundel Corp. v. United States*, 515 F.2d 1116, 1124, 207 Ct.Cl. 84, 99 (1975). Plaintiff carries a heavy burden in seeking to set aside factual determinations made by a Board. *Donald M. Drake Co. v. United States*, 439 F.2d 169, 171, 194 Ct.Cl. 549, 553 (1971). Questions of law decided by the Board, on the other hand, are not binding on this court nor entitled to finality. *Astro-Space Laboratories, Inc. v. United States*, 470 F.2d 1003, 1008–09, 200 Ct.Cl. 282, 293 (1972).

■ Also, it might be helpful to briefly review the precedent upon which the decision in this case will be based. To begin with, it is well established in the law that interest cannot be recovered against the United States upon unpaid accounts or claims in the absence of an express provision to the contrary in a relevant statute or contract, 28 U.S.C. § 2516(a) (1970).[2] *Mar-Pak Corp. v. United States*, 203 Ct.Cl. 718 (1973); *Komatsu Manufacturing Co., Ltd., et al. v. United States*, 131 F.Supp. 949, 132 Ct.Cl. 314 (1955); *United States v. Thayer-West Point Hotel Co.*, 329 U.S. 585, 67 S.Ct. 398, 91 L.Ed. 521 (1947).

In *Bell v. United States*, 404 F.2d 975, 984, 186 Ct.Cl. 189, 205–06 (1968), this court held that recovery of interest paid on borrowings to finance changed work compensable under the "Changes" article was not in conflict with 28 U.S.C. § 2516(a) (1964). The court reasoned that compensation was not being given for the Government delay in payment but as an increased cost of contract performance attributable to the change. The court stated that the contractor was entitled to recover only actual interest paid on borrowings necessitated by the change. Nothing was said of whether a contractor could recover for use of equity capital (*i. e.*, imputed interest or additional profit).

Two recent cases in this court have served to clarify and flesh out the interest point that was enunciated in *Bell, supra.*

In *Framlau Corporation v. United States*, ·568 F.2d 687, 693–95, 215 Ct.Cl. 185 196–99 (1977), the court reaffirmed the *Bell, supra*, holding that the Board could award interest costs as part of an equitable adjustment for changed work where a contractor actually paid the interest and could prove that the borrowing was forced or otherwise made necessary by the changed work. At the same time that it was reaffirming the *Bell* rule, however, the court also declined to follow the line of cases decided by the Armed Services Board of Contract Appeals (ASBCA) upon which the plaintiff herein relies.[3] The court in *Framlau, supra*, stated at 568 F.2d at 694–95, 215 Ct.Cl. at 199:

Since the board's denial of interest on overhead and changes expenses was based on plaintiff's failure of proof concerning plaintiff's borrowing, plaintiff urges that we abandon the *Bell* standard and follow the board's recent cases allowing recovery of interest without regard to whether debt or equity capital is used.

---

2. 28 U.S.C. § 2516(a) reads in its entirety:

"Interest on a claim against the United States shall be allowed in a judgment of the Court of Claims only under a contract or Act of Congress expressly providing for payment thereof."
The language of the subsection during all times pertinent has remained unchanged.

3. *Fischbach & Moore International Corporation*, ASBCA No. 18146, December 13, 1976, 77–1 BCA ¶ 12,300; *New York Shipbuilding Co., A Division of Merritt-Chapman & Scott Corporation*, ASBCA No. 16164, June 25, 1976, 76–2 BCA ¶ 11,979; *Ingalls Shipbuilding Division, Litton Systems, Inc.*, ASBCA No. 17717, April 16, 1976, 76–1 BCA ¶ 11,851; *Lockheed Shipbuilding and Construction Company,*

ASBCA No. 18460, March 29, 1977, 77–1 BCA ¶ 12,458, and *Bailfield Industries, Division of A–T–O, Inc.*, ASBCA Nos. 13418, 13555, 17241, December 30, 1976, 77–1 BCA ¶ 12,308, were not cited by the court but follow in the same line of cases as those cited by the court. Since *Framlau Corp. v. United States*, 568 F.2d 687, 215 Ct.Cl. 185 (1977), was decided on December 14, 1977, the ASBCA has decided another case which follows the same line of reasoning, *Ingalls Shipbuilding Division, Litton Systems, Inc.*, ASBCA No. 17579, February 17, 1978, 78–1 BCA ¶ 13,216. These cases, stripped to their bare essentials, allow compensation (imputed interest or additional profit) for the use of equity capital.

This we are not prepared to do. It may be argued that differing treatment of debt and equity capital follows an artificial distinction and that it rewards thin capitalization, but we are constrained by the statute discussed earlier [28 U.S.C. § 2516(a) (1970)] and further believe that the distinction is supported by reason in that the costs to the contractor of borrowing capital is clearly determinable, while the value to him of the use of equity capital is not so readily ascertainable.

We thus conclude that the denial of interest was correct. [footnotes omitted.]

The second case recently decided in this court was *Singer Co., Librascope Division v. United States*, 568 F.2d 695, 215 Ct.Cl. 281 (1977). This case also reaffirmed the *Bell, supra*, holding that interest costs on a specific loan undertaken in order to finance the changed work are allowable. In addition, it affirmed a second factual situation as falling within the *Bell* rationale that typically occurs in a more complex business environment where a contractor has a regular course of dealings with banks, general business borrowings, and can prove a specific necessity to increase that course of borrowing from its banks due to the outlays necessitated by the changed work. *Singer, supra*, 568 F.2d at 718–19, 215 Ct.Cl. at 321–23.

The plaintiff in the *Singer* case did urge the court to consider that the "equity capital" line of cases decided by the ASBCA[4] made the proof of necessity for borrowing irrelevant, and thus should allow recovery. The court however declined the invitation to so hold in the following manner:

But the case was not presented to the Board on any such theory, and the issue is not without its difficulties for us in view of the ancient doctrine disallowing interest against the Government, in the absence of express statute or contractual provision. *E. g., United States v. Mescalero Apache Tribe*, 518 F.2d 1309, 207

Ct.Cl. 369 (1975), *cert. denied*, 425 U.S. 911, 96 S.Ct. 1506, 47 L.Ed.2d 761 (1976). Our decision here rests solely on the insufficiency of the showing before the Board as to plaintiff's and plaintiff's parent's actual debt policy, how its debt structure was made up in the relevant period, and what connection extra work on constructive changes might have with that structure, all of which were things we could not judicially know and were essential to support Item 11 on the theory on which it was actually prosecuted. Nothing said or done in this case should be taken as intimating how interest or imputed interest should in general be dealt with in computation of equitable adjustments, where a contractor has financed additional work without contemporary reimbursement for it, nor what proof should be requisite to sustain a claim of that sort. This case stands on its own peculiar history. We note, however, that in a decision contemporaneous with this, another panel of this court grapples with the problem and establishes a precedent with respect to it. *Framlau Corp. v. United States*, * * * [568 F.2d 687, 215 Ct.Cl. 185 (1977)].[5]

■ From the above discussion, it is clear that this court still holds to the view that direct tracing to a specific loan or necessity for increased borrowing is still required to be proven in order for a contractor to recover for interest costs under an equitable adjustment theory.

Against this background, it is now appropriate to turn to plaintiff's contentions in this case.

## I.

■ Plaintiff challenges as being arbitrary, capricious, and not supported by substantial evidence the Board's finding of fact that plaintiff failed to prove any direct correlation between expenditures for Modifications 37 and 38 and the borrowings of the corporate headquarters. In support of

4. See note 3, *supra*.

5. *Singer Co., Librascope Division v. United States*, 568 F.2d 695, 698, 215 Ct.Cl. 281, 284–85 (1977).

this argument, the plaintiff points to two portions of the record.

First, plaintiff cites the testimony of William J. Moreland, Jr., Assistant Treasurer of Dravo, who stated that there was a direct effect between what occurred on the Wynoochee Dam project and the borrowings obtained by the Pittsburgh offices. But Mr. Moreland also materially modified this testimony when he further testified that because the financing for all of the divisions was centralized at the headquarters, whether a request for funds by Western necessitated a corporate borrowing depended upon the cash inflow and outflow of the other divisions at that time. If some other division developed cash surplus at the time deficiency money was needed for Western, there would be no need to borrow. Mr. Moreland agreed that Dravo did not incur interest expense needlessly and thus did not automatically borrow money upon cash requests by any particular division. Finally, Mr. Moreland stated that when the proceeds from the different projects were received by the headquarters from each division, the cash lost its identity, and whether particular funds forwarded to Western by the Pittsburgh offices originated as surplus from some other division or from corporate borrowings could not be determined. All money generated was put into a fungible pot and redistributed where necessary. Although it seems plausible that some portion of the extra costs of the Wynoochee Dam project were funded by corporate borrowings, plaintiff did not, and could not, trace any such expenditure to any specific loan made by the headquarters. *See Bell, supra,* 404 F.2d at 984, 186 Ct.Cl. at 205–06. Nor did the above testimony prove any need to increase the level of corporate borrowing at headquarters due to the changed work. *See Singer, supra,* 586 F.2d at 718–19, 215 Ct.Cl. at 321–23.

Secondly, plaintiff cites two documents in the record (Exhibits 11 and 14) which established to the satisfaction of the Board that the Wynoochee Dam project had a negative cash flow (deficit earnings) from August 1970 to June 1972, and that during this time frame the project and Western were "indebted" to the plaintiff parent corporation. Here again, however, the plaintiff's evidence did not prove the critical direct connection between expenditures for the changed work (Modifications 37 and 38), and the borrowing at the corporate headquarters. This proof, although relevant, simply did not go far enough. Plaintiff had to prove that the deficits on the project forced or required additional borrowing at the headquarters level. This is where all the financial transactions took place. This is where all the cash was deposited from all the divisions of the plaintiff corporation. This is where the decisions were made to distribute surplus cash or borrow to meet any deficit needs. Plaintiff had to present the cash position of the parent plaintiff during the critical time frame in order to prove the essential element of necessity. There can be all kinds of reasons why a parent in the position of this plaintiff would borrow money. Without this focus on the parent, in a factual setting such as we have here, the proof fails. Factfinders should not have to speculate as to whether any borrowing was necessitated by changed work such as we have here. This is a matter for the contractor to prove. *See Singer, supra,* 586 F.2d at 719–20, 215 Ct.Cl. at 323–25.

The defendant also correctly points out that during the time frame in question, plaintiff maintained a favorable financial position. The plaintiff had annual net income after taxes ranging from a low $5.7 million in 1971 to a high of $10.7 million in 1974. It had dividends approximating $3 million per year, assets increasing from $187 million in 1971 to a total of $294 million in 1974, and annual revenues running into the hundreds of millions.

Based on the above, it is apparent that the Board's finding of fact on this point is supported by the record and is not arbitrary and capricious.

## II.

Plaintiff next asserts that even if the Board's factual finding is correct, it

erred legally in requiring that a contractor must prove a direct traceability of or necessity for borrowings to expenditures for change order work before any recovery of financing expense can be allowed. Plaintiff contends that recovery should be allowed where the fact of financing was undisputed although it could not be established which particular dollar of borrowed capital was used to pay the cost of the changed work. Plaintiff relies for this assertion on several cases decided by the ASBCA.[6] Although these cases do show a certain evolution in rationale as to whether "clear necessity for borrowings occasioned by the change" must be proven by the contractor, this court has not followed this evolutionary pattern. This court requires that a clear necessity for borrowings occasioned by the change be proven. Here, the plaintiff has failed to establish this clear necessity. A mere showing of a history of business borrowings and a course of dealings with various banks during the time frame at issue is insufficient to prove a claim for interest. *Singer, supra*, 586 F.2d at 718–19, 215 Ct.Cl. at 321–23.

The Board did not err as a matter of law in so concluding.

### III.

Finally, plaintiff contends that if it is not entitled to recover its interest costs on a debt capital (borrowing) theory, then it should recover for the loss incurred in the use of its equity capital to fund the changed work. Plaintiff points out that an equitable adjustment is simply a corrective measure "utilized to keep a contractor whole when the Government modifies a contract." *Bruce Construction Corp. v. United States*, 324 F.2d 516, 518, 163 Ct.Cl. 97, 100 (1963). As earlier noted, the ASBCA has allowed recovery on an equity capital theory in several cases because, in its view, a contractor is entitled to some fair return for the use of its private capital on changed work, as com-

pensation for the loss of the opportunity to invest that money elsewhere.[7]

Admittedly, plaintiff's contention has certain appeal. With a high rate of inflation, it is unrealistic to think that a delay in payment by the Government does not adversely affect plaintiff's financial situation, even in the absence of specific borrowings. The mere use of plaintiff's money for the changed work, without immediate reimbursement, clearly costs the plaintiff something. Moreover, to deny recovery is perhaps to draw an artificial distinction between smaller companies, with simple internal financing arrangements and which are entirely debt capitalized, and larger companies, with more complex financial organizations and which may employ equity as well as debt capital. The latter would be hard put to establish the stringent requirements for an interest claim on a debt capital theory, as plaintiff has failed to do here.

Nevertheless the Board rejected plaintiff's argument largely on the ground that the reservation by plaintiff was limited only to a claim for *interest* and did not preserve consideration of an additional *profit* allowance to compensate it for the use of its equity capital. Also, it pointed out that its Board case precedent and other precedent did not permit recovery. Plaintiff, of course, challenges those conclusions. In light of the court's recent decision in *Framlau, supra*, 568 F.2d at 695, 215 Ct.Cl. at 199, it need not be decided whether plaintiff's reservation was broad enough to cover its present position. For, even if consideration for an additional profit allowance was reserved, the court in *Framlau* rejected a contractor's recovery for the use of its equity capital. The court refused to adopt the equity capital theory, noting that "the cost to the contractor of borrowing capital is clearly determinable, while the value to him of the use of equity capital is not so readily ascertainable." *Framlau, supra*, 568 F.2d at 695, 215 Ct.Cl. at 199.

---

**6.** *Ingalls Shipbuilding Division, Litton Systems, Inc.*, ASBCA No. 17717, 76–1 BCA ¶ 11,851; *Aerojet-General Corp.*, ASBCA No. 17171, 74–2 BCA ¶ 10,863; *Keco Industries, Inc.*, ASBCA No. 15131, 72–1 BCA ¶ 9262.

**7.** See note 3, *supra*.

Although plaintiff has ably argued for its position in this regard, the court must apply the law as it finds it, and it finds 28 U.S.C. § 2516(a) (1970) precluding recovery under these factual circumstances. This court is not free to substitute its view of what the law ought to be; that function is reserved for the Congress.

This final argument of plaintiff must, therefore, also be rejected. The Board committed no error as a matter of law.

It is, therefore, concluded that the Board decision was supported by substantial evidence, was not arbitrary or capricious, and was not contrary to law.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment is denied, defendant's cross-motion for summary judgment is granted, and the petition is dismissed.