645 F.2d 1086
 207 U.S.App.D.C. 161
 Leonard N. BEBCHICK et al., Petitioners,
v.
WASHINGTON METROPOLITAN AREA TRANSIT COMMISSION, Respondent,
D.C. Transit System, Inc., Intervenor.
D.C. TRANSIT SYSTEM, INC., Petitioner,
v.
WASHINGTON METROPOLITAN AREA TRANSIT COMMISSION, Respondent,
Leonard N. Bebchick et al., Intervenors.
 Nos. 23720, 23743, 74-2056 and 75-1632.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued March 14, 1979.
Decided March 12, 1981.
 
 On Supplementary Review Proceedings and Appeal from Washington Metropolitan Area Transit Commission.
 Harvey M. Spear, New York City, Stanley J. Fineman, Washington, D. C. and Maxwell E. Cox, New York City, with whom Wilkes & Artis, Washington, D. C., was on the brief, for D.C. Transit Co.
 Leonard N. Bebchick, Washington, D. C., with whom Martin, Whitfield, Smith & Bebchick, Washington, D. C., were on the brief, for Leonard N. Bebchick et al.
 Donald J. Balsley, Jr., with whom Conner, Moore & Corber, Washington, D. C., were on the brief, for Washington Metropolitan Area Transit Commission.
 Before ROBINSON and MacKINNON, Circuit Judges, and DAVIS* Judge, United States Court of Claims.
 Opinion for the Court filed by Judge DAVIS.
 DAVIS, Judge:
 
 
 1
 This is another round in a litigation involving D.C. Transit System, Inc. (Transit) which goes back almost two decades. The complex details are set forth in earlier decisions.[1] It is enough to say the following, very summarily, at this point: When Transit, as the new franchisee of the mass transportation system within the Washington metropolitan area, acquired in 1956 the assets of Capital Transit Company, those assets had a net book value of some $23,880,000, according to Transit figures. Transit says it paid $13,540,000 for the assets (and assumed Capital's obligations). As envisaged, when Transit acquired the assets, the company then converted (as of August 15, 1963) to an all-bus operation, and certain properties no longer needed were removed from operating status (i. e., put "below the line"). Shortly thereafter, the Commission determined a deficiency in the depreciation reserve needed to cover those properties (put "below the line") while they were operating. Meanwhile in 1963, in Bebchick I, supra, 115 U.S.App.D.C. at 232-33, 318 F.2d at 203-04, this court, after reversing a particular fare increase, had established (from the invalid fares) a riders' fund, a reserve on Transit's books for the benefit of the consumers. The Washington Metropolitan Area Transit Commission (Commission), which succeeded the D.C. Public Utilities Commission as the regulatory agency, wished to use this riders' fund to help make up the depreciation deficiency. The riders' fund was also involved, at about the same time, when this court overturned later higher fares which had been allowed by the Commission but the court provided that, though the fares were improper, Transit was entitled to retain a fair return; if there were not such a fair return the riders' fund could be used to make up the difference, while if excess earnings existed they were to be added to the riders' fund. The matter of the adjustments to the riders' fund, including the existence vel non of excess earnings, was returned to the Commission. The Commission then ruled that there were no excess earnings and that a substantial deficiency still existed in the depreciation fund which should be made up from the riders' fund.
 
 
 2
 In Bebchick II, in 1973, the court again reversed the Commission, holding that there were in fact considerable excess earnings which should be added to the riders' fund ($1,461,756) and also that the Commission should undertake to decide whether Transit's investors had been compensated for the depreciation deficiency by the appreciation in value of the depreciable portion (i. e. buildings) of six particular properties found no longer necessary for non- trolley operation transferred from above to below the line.
 
 
 3
 On remand from Bebchick II, the Commission recommended that Transit give a net credit to the riders' fund in this case. At the same time the Commission made other recommendations in related cases now before the court.[2] The present opinion deals only with this Bebchick case (which we shall call Bebchick III ). Both the Bebchick group and Transit seek review of certain of the Commission's determinations connected with this specific case. We have decided that this Bebchick case has a limited compass, and can be dealt with as encapsulated, separately and apart from any determinations ultimately to be made in the other proceedings now before us.
 
 
 4
 * In Bebchick III only six buildings (not land) are involved in the issue of whether Transit's investors have been compensated by appreciation in value of these properties for any of the depreciation deficiency.[3] Transit's main point is that the appreciation in value is to be determined by using as one limit the market value of the properties when acquired by Transit in 1956 and the other the market value when placed below the line in or around 1963.[4] The Commission, somewhat reluctantly, held that the bottom limit was not starting market value, but book value. Bebchick et al. support that position.
 
 
 5
 Whatever may be the result in the other cases argued and briefed together with this one, we think that in this Bebchick III case the starting point must be book value, not market value. Not only did Bebchick II refer several times to the difference as being between book value and market value, and not between market value in 1956 and market value in 1963-64, but the theory of that opinion likewise demonstrates that book-value-to-market-value is the correct criterion. The court first noted that "On remand, the (then) protestants (Bebchick et al.) argued that a prime source of such reimbursement was the difference between the book value of Transit's property and their greater fair market value when they were transferred below the line or to nonoperating subsidiaries." Bebchick II, 158 U.S.App.D.C. at 90, 485 F.2d at 869. The court then observed that the Commission had initially rejected the protestants' approach, and the latter urged that that ruling was erroneous. Id. The court's answer was: "We hold that the Commission was wrong, and that the depreciation reserve deficiency may have been wholly wiped out through the transfer out of operation of these properties no longer used in the transportation business." Id. In that connection the court pointed out that the Commission had first held "that it was precluded by Williams from considering any such increase from book value to market value as reimbursement for the depreciation deficiency," and the court proceeded to answer that point. Bebchick II, 158 U.S.App.D.C. at 90-91, 485 F.2d at 869-70.
 
 
 6
 After rejecting any "assumed negative directive in Williams," the court considered whether "the Commission was justified in refusing to take account of the excess of market value over book value of the properties transferred out of operation." Bebchick II, 158 U.S.App.D.C. at 91, 485 F.2d at 870. The court's answer was negative, and its discussion shows that (a) it viewed the depreciation deficiency as representing the short-fall of the investors' recovery of their actual cost, and (b) book value reflected the maximum limit of Transit's investment cost.[5] The opinion emphasized that the depreciation deficiency represented "the amount by which it was supposed, prima facie, that the investors had not been properly compensated in the past, through fare payments, for the diminished value diminished through depreciation of their investment up through 1963.... In other words, the investors were presumed to have been deprived, up to the amount of the deficiency, of the return of that allocable portion of their investment, and were therefore entitled to have the remainder returned in another form." The court also referred to the investor's allocable recoupment offsetting the prior undercharges for depreciation as "recoupment of the theretofore unrecouped part of the investment." Bebchick II, 158 U.S.App.D.C. at 91-92, 485 F.2d at 870-71.
 
 
 7
 As if to cap the point that the recouping gain could not be market value to market value but must be book value to market value, the Bebchick II opinion then stressed that, at the time the properties were taken out of operation and placed below, it appeared probable that the difference between book value (at which they were transferred) and market value (at that time) of the depreciable part alone "may well have been sufficiently high that the difference between the two figures the gain in value of those depreciable assets may have more than offset the entire depreciation deficiency the theretofore unrecovered cost of the assets represented in the deficiency which should have been recovered prior to August, 1963." Id. at 92, 485 F.2d at 871.
 
 
 8
 The court added flatly: "On principle, this gain can be appropriately considered as returning the otherwise unrecovered cost to the owners." Id. The court then proceeded to justify the award of such a sum to the fare payers, and to rely in part on the principle of Commission Regulation 61, relating to depreciable properties put below the line, which required the ratepayers to get the benefit of the excess of fair market value at the time of transfer over the investors' unrecovered cost. Id. at 92-94, 485 F.2d at 871-73. And at the end of its discussion of the depreciation deficiency, the court again said, in the same vein, that the Commission had erred in refusing to consider whether Transit's investors were compensated by the gain represented by the excess of market value over unrecovered cost of properties transferred to below-the-line status. Id. at 96, 485 F.2d at 875.
 
 
 9
 This thread throughout Bebchick II emphasizing the recovery of unrecovered cost was correct for this case whatever can be said of other companion cases not now involved. Depreciation relates to the original cost of the property, recorded on its books and taken over by Transit in 1956 when it purchased the assets beneath book value. The depreciation deficiency represented that part of the depreciation based on the original cost which had not been recovered up to 1963 through the fares. Transit was entitled to recover, at the very most, the cost with which it was charged when it purchased the assets in 1956. If the investors recovered that deficiency through the much higher market value of the properties received in 1963 when those assets were taken out of operation and no longer marked for the farepayers, they have been fully paid for depreciation they have fully recovered their actual investment and more.
 
 
 10
 Transit argues that it is entitled to the benefit of its bargain in buying the assets in 1956 at a figure substantially below their market value and book value. For this case that argument can have no merit. In recovering depreciation Transit's investors are entitled to recover no more than their cost which was book value or less. In calculating the payments to them of that cost, there is no reason to exclude the so-called "benefit of the bargain" increase in value. That benefit, if it existed, was not automatically and definitively set apart forever, for all purposes, as profit for the investors. If, as we think, that excess in value paid the investors for the short-fall in recovering depreciation, there is no reason in equitable consideration why the "benefit" nevertheless has to be preserved intact and the riders have to pay for the deficiency through the riders' fund. Even if Transit and its investors considered that they had made a good bargain in 1956, they had no reason to think that that bargain was fixed in concrete, not subject to the vicissitudes of operation. One of those vicissitudes was a miscalculation in depreciation. As we intimated in Bebchick II and now hold, the investors actually gained a great deal when the six properties were taken out of operation. It is equitable that part of that full gain should be allocated to the depreciation deficiency incurred while the properties were in operation. Indeed, the investors have been allowed for depreciation more than their own cost since they bought below book value and yet depreciation is and has been calculated on the basis of book value. To that extent they may in fact be receiving the benefit of a bargain they made in 1956. Nothing more is warranted in this particular case.
 
 II
 
 11
 Transit complains, too, that the Commission included the Grace Street Shop and the General Office Building among the six structures the increase in value of which was taken into account for the depreciation deficiency. Transit says that the date for deciding this matter was August 15, 1963, as of which the deficiency was formally established, and that the two structures were put below the line somewhat later (in September 1963 and January 1964, respectively). These two properties were among the six specified in Bebchick II as relevant to the problem of that case, and the Commission followed the court's lead. But Transit now contends that this listing in Bebchick II was inadvertent and the line should be rigidly drawn as of August 15, 1963.
 
 
 12
 The other side disputes whether the August 1963 date is the proper date as of which the deficiency was established, but we need not go into that problem. The historical fact is that the court well knew in Bebchick II that these two properties had been taken out of operation and put below the line in or around 1963, and it deliberately included them in the six properties to be evaluated for this case. The precise date of August 15, 1963 (which appears to be the very last day the trolleys ran) has no more than a shorthand significance in this connection; the truly relevant facts are that the depreciation deficiency came about during the time these facilities were in service and that they were placed below the line at about the same general time as the setting up of the depreciation deficiency. This is shown by the holding in Williams that the riders could be charged with any unreimbursed depreciation deficiency arising out of transfer below the line of these very facilities. 134 U.S.App.D.C. at 372-73, 377-78, 415 F.2d at 952-53, 957-58. If, as Williams held, the riders must bear the unreimbursed deficiency with respect to these two properties, it cannot be said that they are not entitled to the benefit attributable to the placing of these facilities below the line. The two holdings go hand in hand. The Commission was therefore correct in including the two properties in its computation of Transit's gain from taking the six buildings out of operation.
 
 III
 
 13
 There is a sharp dispute over taxes deducted by the Commission from the increase in value of the properties transferred out of operation. For properties voluntarily sold the Commission deducted the taxes actually imposed, while for those merely transferred (but still retained by Transit) it estimated the taxes which it thought would be imposed in the future when the structures would be sold. This it fixed at the rate of 28.75 percent of the gain, including 25% for the federal capital gains tax and an addition for the District of Columbia capital gains tax (which did not come into effect until 1969). The Bebchick group attacks this ruling on two grounds: (a) no tax deduction should be allowed at all, and (b) if there is to be a deduction for taxes it should follow the calculation made by the expert accountant reconstructing on behalf of the Commission's staff Transit's taxes (as if the structures had then been sold) for the actual times when the buildings were placed below the line.
 
 
 14
 The first contention rests on the twin premises that, first, the farepayers have already paid, as part of the improperly increased fares, Transit's income taxes on the fares already held to have been illegally increased, and, second, that Transit will obtain a tax benefit (through appropriate deductions from its then taxes) from the restitution payments it will be required at some future time to make to the farepayers. It is thought that, if these two factors are taken into account, the net benefit to Transit will equal or exceed any tax expense incident to a presumed sale of the below-the-line facilities in 1963-64.
 
 
 15
 For this Bebchick III case, we reject this approach both because it departs from the court's express mandate on the calculation of reimbursement of the depreciation deficiency through the value-increase of the transferred properties, and also because it does not fit with this particular case which is not primarily concerned with improperly increased fares but also with use of the riders' fund to satisfy the depreciation deficiency. The Bebchick II opinion said specifically that the amount of value-increase credited to the farepayers should be decreased by taxes which might have reduced the gain if the properties had been sold. 158 U.S.App.D.C. at 96 n.137, 97, 485 F.2d at 875 n.137, 876. This precise mandate as to the imposition of taxes at the time of presumptive sale did not contemplate that taxes, though present at the time of assumed sale, might be disregarded for extrinsic reasons, relating to prior or later tax benefits and burdens.
 
 
 16
 Moreover, the theory that Transit's taxes should be disregarded rests in large part on the assumption that the farepayers had already paid unnecessary taxes when the fares were illegally raised. In this case that is not a predominant element. Though the riders' funds commenced with such invalid fares, the computation of Transit's gain from the six properties has had in largest part to do, not with the original composition of the riders' fund, but with the distinct question whether that fund should be used to satisfy the depreciation deficiency. That is a separable issue which has been, and should be, considered by itself, and outside equitable considerations have small impact on the correct calculation of the investors' gain with respect to the depreciation deficiency. As for the taxes to be saved by Transit in the future years in which it pays restitution to the riders' fund to satisfy the Bebchick claims, we cannot calculate that saving or even if it will exist. The problem of such a saving is too nebulous for us to say that it will necessarily or probably offset any presumed tax expense in the year of putting-below-the-line.
 
 
 17
 There is more merit to the second point made by the Bebchick group. As we have said the court's instructions in Bebchick II were to find the tax which might have reduced the gain if the properties had actually been sold at the time they were set below the line. The Commission did not adhere to this exact directive when it sought to figure out the tax Transit would have to pay when, years later, it came in actual fact to sell the properties. For instance, the District of Columbia capital gains tax was not in effect when the properties were transferred out of operations in 1963-64, and therefore should not have been considered at all. Transit seems to think that the Constitution forbids any solution pegged to the transfer dates, but rather that court and commission have to try to figure out what taxes will actually be paid when the properties are sold in the future. To us this is an insubstantial invocation of the Constitution in a context wholly apart from the direct imposition of taxes. Our effort is simply to determine, for the purposes of deciding whether the investors have already been compensated for the depreciation deficiency, what gain the investors can be assumed to have made on the transfer of the properties. In that limited context it is wholly reasonable to make a hypothetical recalculation of Transit's taxes for the transfer years to see what tax impact the assumed gain would presumptively have had. There is no compelling need to try to compute what burden Transit will actually bear when it comes to sell the properties.
 
 
 18
 Transit did not supply the Commission with any evidence of its actual tax expense if it had sold the transferred properties on the respective dates of transfer "below the line." But the Commission's staff presented (through Douglas W. Banks, a partner of Touche Ross & Co.) a careful study along these lines which has now been accepted by all parties except Transit and the Commission itself. The Banks study takes account of all factors relevant for 1963-64. It did not allocate tax expense between land and building components of the transferred properties, but such a precise allocation is unnecessary for this Bebchick III case if we hold, as we do,[6] that the net gain on the six buildings, no matter how calculated, does not fall below $1,058,856 (the amount of the depreciation deficiency). For this case the Banks study is acceptable and the gain on the six properties should be computed on the basis of its general methodology. On remand, the Commission should make this numerical determination of the tax expense, following the Banks report.
 
 IV
 
 19
 The Bebchick group asks for interest on the restitution from Transit.[7] The Commission thought this a matter beyond its jurisdiction and did not pass on it. There is no doubt that interest is allowable on funds which are required to be repaid as restitution. See American Law Institute, Restatement of Restitution, § 156; United States v. United Drill & Tool Corp., 87 U.S.App.D.C. 236, 238-39, 183 F.2d 998, 1000-01 (1950); Mitchell v. Riegel Textile, Inc., 104 U.S.App.D.C. 139, 140-41, 259 F.2d 954, 955-56 (1958). In this instance, Bebchick et al. never waived their demand for interest on the funds ultimately required to be restored to the riders' fund, but insisted on it at the proper times.
 
 
 20
 The parties have discussed when, if ever, the amount to be restored became relatively certain and what are the demands of fairness and equity. In this equitable proceeding, we think that the fair and appropriate date from which to accrue interest is June 28, 1973, the day on which Bebchick II was decided. In that decision the court decided for the first time that Transit had earned excess monies on prior fares which should be paid into the riders' fund overturning a contrary Commission ruling. The other major decision in Bebchick II was on the deficiency in depreciation reserve. The Commission refused to consider that deficiency as already compensated for. Reversing, the court held that the Commission should consider as compensation for the depreciation deficiency the increase in value from book value to market value of the six buildings put below the line in 1963-64. See Part I, supra. More than that, the court strongly suggested that, according to the ratepayers' then presentation, the deficiency was entirely offset by the appreciation in value, and it remanded the case in large part because the Commission had not so found definitively and Transit had not so conceded. The remand proved the Bebchick group to be substantially correct on its earlier view of valuation. Bebchick II, 158 U.S.App.D.C. at 96-97 n.137, 485 F.2d at 875-76 n.137. It is fair, therefore, to start the running of interest in this case on the date Bebchick II was decided.
 
 
 21
 Since December 19, 1974, there has been on deposit, in the court's custody, with American Security Bank, a large sum larger than the amount of the depreciation deficiency. This account has been earning interest since December 19, 1974. The rate at which interest has been paid on the sums in that account is the proper rate to charge Transit for the restitution to the Bebchick group since December 19, 1974.
 
 
 22
 As for the year-and-one-half period from June 28, 1973 to December 19, 1974, we have no ready-made guide. The Bebchick group suggests 7.1% for this period (based on the rise in the Consumer Price Index and the prime rate charged by Union First National Bank of Washington and its predecessor). Transit concentrates on denying any liability for pre-judgment interest, (i. e. prior to a court order directing restitution of a very specific sum) and does not offer any particular interest rate. The Commission makes no recommendation. In these circumstances, we choose, rather than remanding for a further hearing on this problem, the 7.1% figure suggested by the Bebchick group. It is comparable but somewhat less than the percentage (71/2%) chosen by the Court of Claims, for that period, for its interest awards on just compensation. See Pitcairn v. United States, 212 Ct.Cl. 168, 189-97, 547 F.2d 1106, 1120-24 (1976), cert. denied, 434 U.S. 1051, 98 S.Ct. 903, 54 L.Ed.2d 804 (1978); Tektronix, Inc. v. United States, 213 Ct.Cl. 257, 273-75, 552 F.2d 343, 352-53 (1977), appealed after remand, 575 F.2d 832, cert. denied, 439 U.S. 1048, 99 S.Ct. 724, 58 L.Ed.2d 707 (1978); Miller v. United States, 223 Ct.Cl. ---, ---, 620 F.2d 812, 837-40 (1980). So far as we can judge, 7.1% is a fair rate for that period, and not too high.
 
 V
 
 23
 The next problem is the burden of the expenses of the remand proceedings. Though it initially assessed against Transit some $200,000 for such cost, the Commission also held that Transit is entitled to the full amount of the costs assessed against it for the Commission's expenses, plus (apparently) all the costs and expenses Transit incurred on its own behalf in connection with the proceedings. This latter ruling the Commission made because it considered the remand proceedings to be a reopening of prior rate proceedings in which costs and expenses are allowable charges, ultimately to be assumed and paid by the farepayers.
 
 
 24
 We disagree with the Commission's justification for deducting all the costs of the remand proceedings from any restitution to be made by Transit in this case. The remand was not a rate proceeding; the Commission acted more as a special master assisting this court in determining the equitable disposition of the fund available for restitution. Bebchick II, supra, 158 U.S.App.D.C. at 97, 101, 485 F.2d at 876, 880. The Washington Metropolitan Area Transit Regulation Compact (Compact) has no firm directives on the allocation of expenses for this kind of proceeding. Though the Compact anticipated that the cost of rate proceedings would be considered in setting rates, it also provided in Title II, article XII, section 19(a), that "(a)ll reasonable expenses of any investigation or other proceeding of any nature, conducted by the Commission, of or concerning any carrier, and all expenses of any litigation, including appeals, arising (therefrom) ... shall be borne" by the carrier. Pub.L.No. 86-794, 74 Stat. 1031, 1047 (1960), amended by Pub.L.No. 87-767, 76 Stat. 764 (1962). In the end, equity must prevail on this question, which is not one of the Commission's authority but of the court's own judgment.
 
 
 25
 In view of the definitive nature of our holdings in 1973 in Bebchick II (discussed supra) we think that it would be an injustice to cast upon the Bebchick group (and the other farepayers) any part of the Commission's expenses (including Transit's own expenses) connected with the remand proceedings the court directed in Bebchick II in 1973. For this particular case, the remand was largely unnecessary. Transit rejected figures which it later accepted on the remand, and likewise for this case part of the Commission's activities did not require any further hearings at all. Accordingly, there should be no deduction from the restitution ordered as a result of Bebchick II and of this Bebchick III case on account of the cost of the Commission's proceedings since 1973. We are not advised as to any expenses incurred before that time, and in any event we consider that a fair adjustment for that earlier period, in this case, is to allow each party (including the Commission) to bear its own costs. To that extent the Commission's ruling on expenses is reversed and modified.
 
 
 26
 As we have said, the Commission assessed $200,000 (in two orders) against Transit for the cost of the remand proceeds.[8] Transit challenges the Commission's right to make those orders. We have already held that no part of the remand costs can be deducted from the restitution ordered on account of the Bebchick group. The result of that ruling is that Transit will have to bear at least the Bebchick group's share of those costs. It is thus enough to say, in this case, that we think that the Commission had power under the Compact to make the $200,000 assessment against Transit at least for the time being and at any rate we now confirm that action insofar as the Commission acted as our instrumentality in the equitable distribution of the fund to be restored.
 
 VI
 
 27
 By December 1975 the Commission ordered Transit to deposit $1,461,756 with the Commission.[9] This amount is being held as part of the court's fund in the American Security Bank. Transit's point is that it is entitled to recover from this amount, at once, the sums of $283,869 (on the cost-of-living issue already finally decided in Transit's favor) and of $273,060 (on the bus maintenance issue also decided for Transit). We think, however, that Transit should not be permitted to make these particular withdrawals until it is authoritatively determined (a) what is the full restitution owing on account of the claims of the Bebchick group, and (b) the resources available to pay that amount. Neither of these matters has yet been formally determined, though we have held above that none of the deficiency depreciation can be taken out of the riders' fund or the restitution owing on behalf of the Bebchick claims.[10] It is therefore proper to leave the Commission-ordered deposit of $1,461,756 unreduced at present, and also to leave that sum for the time being in the court fund.
 
 VII
 
 28
 Some of the riders' representatives ask for sequestration of Transit's assets, or other court action to assure payment of the restitution ultimately awarded. The Bebchick group, which has a limited fund with which to deal, does not seem to press hard for this form of relief. In any event we have in the past refrained from affirmative and directory relief of this kind, and we see no need to change our position at this time in this particular case. For the claims of the Bebchick group, at least, we are satisfied at the present that it is very unlikely that there will be insufficient money or assets (including that in the court's fund) to satisfy the restitutionary demand.
 
 VIII
 
 29
 Out of an excess of caution, we add that the various equities and offsets asserted by Transit have no application to the limited claims we are now considering, those of the Bebchick group. Those restricted claims, centering in the riders' fund established in 1963, are set apart from the other claims as to which the equities or offsets may be relevant. Bebchick II was very specific in its holdings and did not contemplate that any of these equities should be considered in connection with this distinct restitutionary sum.
 
 
 30
 We add that the Commission did not determine attorneys' fees for the Bebchick group, and the latter does not ask us to do so at this stage. We have already decided that the Commission can and should make this assessment. Bebchick II, 158 U.S.App.D.C. at 97-98, 101, 485 F.2d at 876-77, 880. On the further remand which is necessary because of the Commission's excessive reduction of the value-increase because of tax expense, the Commission should make an initial determination of attorneys' fees for the counsel representing the Bebchick group.
 
 CONCLUSION
 
 31
 Though we have accepted in greatest part the Commission's recommendations, a remand is needed for the Commission to recalculate the tax expense to be deducted from the value increase on the six properties taken out of operation. After that is done, the Commission should compute the precise amount of the total restitution due in this Bebchick group case, including interest as provided in Part IV, supra.[11] No offsets should be made from this amount, but the Commission should determine the amount it recommends as attorneys' fees for counsel for the Bebchick group (to be taken out of the restitutionary fund). As already indicated, Bebchick II, 158 U.S.App.D.C. at 101, 485 F.2d at 880, the Commission should frame recommendations for the suitable disposition of the balance of this restitutionary fund. Our jurisdiction of this case continues to be retained in full.
 
 
 32
 So ordered.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. § 293(a) (1976)
 
 
 [1]
 See Bebchick v. Public Utilities Comm'n, 115 U.S.App.D.C. 216, 318 F.2d 187 (en banc), cert. denied, 373 U.S. 913, 83 S.Ct. 1304, 10 L.Ed.2d 414 (1963) (Bebchick I ); D.C. Transit System, Inc. v. Washington Metropolitan Area Transit Comm'n, 121 U.S.App.D.C. 375, 350 F.2d 753 (en banc 1965); Williams v. Washington Metropolitan Area Transit Comm'n, 134 U.S.App.D.C. 342, 415 F.2d 922 (en banc 1968), cert. denied, 393 U.S. 1081, 89 S.Ct. 860, 21 L.Ed.2d 773 (1969); Bebchick v. Washington Metropolitan Area Transit Comm'n, 158 U.S.App.D.C. 79, 485 F.2d 858 (1973) (Bebchick II ). See, also, Democratic Central Committee of the District of Columbia v. Washington Metropolitan Area Transit Comm'n, 158 U.S.App.D.C. 7, 485 F.2d 786 (1973) (D.C.C.I.); and Democratic Central Committee of the District of Columbia v. Washington Metropolitan Area Transit Comm'n, 158 U.S.App.D.C. 107, 485 F.2d 886 (1973) (D.C.C. II ). Certiorari was denied in D.C.C. I and D.C.C. II in 415 U.S. 935, 94 S.Ct. 1451, 39 L.Ed.2d 493 (1974)
 
 
 [2]
 These other cases are: Democratic Central Committee of the D. of C. v. Washington Met. Area Transit Commission, No. 21865; Democratic Central Committee of the D. of C. v. Washington Met. Area Transit Commission, No. 24398, and consolidated cases No. 24415 and 24428
 
 
 [3]
 Five of the six properties were transferred to separate subsidiaries, the sixth (Grace Street Shop) was transferred directly below the line Central Garage (transferred to Georgia Avenue Estates); Northeastern Garage (4th Street Estates); M Street Shop (M Street Estates); Navy Yard Carhouse (L Street Estates); General Office Building (3600, Inc.); Grace Street Shop
 
 
 [4]
 Transit does not contest the Commission's findings as to the book and market values at the relevant times. Except for taxes (Part II, infra), the Bebchick group does not challenge these figures
 
 
 [5]
 In D. C. C. II, 158 U.S.App.D.C. at 118, 485 F.2d at 897 (decided the same day as Bebchick II ), the court said:
 " * * * we hold in Bebchick that, at least for the depreciable part of those withdrawn assets, the difference in value between the book figure at which the items were transferred and the fair market value at the time of transfer should be considered reimbursement to Transit's investors for the depreciation deficiency with which Bebchick was concerned."
 
 
 [6]
 No party disagrees
 
 
 [7]
 Bebchick et al. have filed in No. 23720 a petition for the award of interest. This is to be considered along with the main cases; the briefs in those cases also discuss the interest problem
 
 
 [8]
 This was done on the apparent assumption that the costs would reach $200,000
 
 
 [9]
 These are excess profits now under the court's control. The amount correlates to the amount found by the court as Transit's earnings in excess of the conceded fair return. See Bebchick II, supra, 158 U.S.App.D.C. at 101, 485 F.2d at 880
 
 
 [10]
 Even after the Bebchick group's claims are finally decided, there will remain the restitutionary amounts, if any, owing on account of the claims of D.C.C. I and II claimants
 
 
 [11]
 If the Bebchick group has thus far borne any of the nonattorney expenses of the remand (e. g., the fees of expert witnesses) the proper amount should be calculated by the Commission and added to the restitutionary fund (in accord with Part V, supra)