**DISTRICT OF COLUMBIA, Appellant,**

v.

**C.J. LANGENFELDER & SON, INC., Appellee,**

and

**C.J. LANGENFELDER & SON, INC., Cross-Appellant,**

v.

**DISTRICT OF COLUMBIA, Cross-Appellee.**

Nos. 87-834, 87-833.

District of Columbia Court of Appeals.

Argued Dec. 14, 1988.
Decided May 17, 1989.

Lutz Alexander Prager, Asst. Deputy Corp. Counsel, with whom Frederick D. Cooke, Jr., Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on the brief for appellant/cross-appellee.

J. Roy Thompson, Jr., Washington, D.C., for appellee/cross-appellant.

Before NEWMAN, TERRY and SCHWELB, Associate Judges.

NEWMAN, Associate Judge:

This case arises from a dispute involving a 1968 contract between the contractor, C.J. Langenfelder & Son, Inc. (Langenfelder) and the District of Columbia. The basic issue concerns whether in 1968, the contract term "equitable adjustment" included payment of interest on sums owed by the District to Langenfelder for costs incurred by Langenfelder in 1969–70, but not paid to Langenfelder until June 19, 1980. Because contract terms must be construed according to their customary and common usage at the time when the parties executed the contract, we disagree with the trial court's holding that the term "equitable adjustment" in this 1968 contract was meant to include interest foregone on capital expended to perform changes under the contract. Accordingly, we reverse.

I

The District of Columbia contracted with Langenfelder in 1968 to construct a portion of U.S. Highway I-95 near the Rayburn House Office Building at a cost of approximately 24.5 million dollars. The contract directed that Langenfelder dispose of waste material resulting from the highway construction project at Dyke Marsh, an area in Virginia that was being filled to a grade that would cause flooding and allow restoration of the former swampland. In February of 1969, less than a month after the work had begun, the District imposed restrictions on Langenfelder's use of Dyke Marsh which forced the contractor to incur additional costs at Dyke Marsh and to utilize private dump areas in Virginia and Maryland.

The contract contained the standard "changes clause" present in United States contracts at that time, and provided for "equitable adjustments" to be made in the contract price whenever the contracting officer ordered changes in the contract specifications which increased or decreased the cost of performance.[1] Specifically, the contract stated:

Article 3. Changes.—The contracting officer may at any time, by a written

---

1. The contract language was typical for District and federal government contracts in the 1960s. As the Supreme Court stated in *United States v. Utah Construction & Mining Co.*:

The typical construction contract between the Government and a private contractor provides for an equitable adjustment of the contract price or an appropriate extension of time, or both, if the government orders permitted changes in the work or if the contractor encounters changed conditions differing materially from those ordinarily anticipated.

384 U.S. 394, 396, 86 S.Ct. 1545, 1547, 16 L.Ed. 2d 642 (1966).

The contract language at issue in this case is almost identical to the language used in contracts with the United States government. *See, e.g., id.* at 397 n. 1, 86 S.Ct. at 1547 n. 1 (construing contract with language: "The contracting officer may at any time, by a written order, and without notice to the sureties, make changes in ... this contract and within the general scope thereof. If such changes cause an increase or decrease in the amount due under this contract, or in the time required for its performance, an equitable adjustment shall be made and the contract shall be modified in writing accordingly."); *Bell v. United States,* 186 Ct.Cl. 189, 404 F.2d 975, 976 (1968) (same).

order, and without notice to the sureties, make changes in the drawings and/or specifications of this contract and within the general scope thereof. *If such changes cause an increase or decrease in the cost of performing the work under this contract, or in the time required for its performance, an equitable adjustment shall be made and the contract shall be modified in writing accordingly.*

Contract at 3 (emphasis added).

The parties do not dispute the actual cost of the changes computed as part of the equitable adjustment; after extensive litigation in the 1970s,[2] the Contract Appeals Board (Board) determined that the District owed Langenfelder $320,877.27 for the cost of performing the changes unilaterally imposed by the District under the contract. This amount, however, was not paid by the District to Langenfelder until June 19, 1980. The contractor asserts that it is owed interest[3] on this amount, that the interest is actually a cost that should be computed as part of the equitable adjustment, and that this additional cost should have been paid to it on June 19, 1980 as well.[4]

The contractor first brought its interest claim before the Board in 1975. The Board determined that the District owed Langenfelder interest or the "cost of operating capital" incurred by Langenfelder between February 19, 1969 and May 19, 1970.[5] The Board concluded, however, that Langen-

2. Langenfelder first filed its claim for an equitable adjustment in 1969, alleging that the District's decision to restrict the use of Dyke Marsh had increased the cost of performance under the contract. This claim was filed with the District of Columbia contracting officer pursuant to Article 15 of the contract, which also provided for appeal from the decision of the contracting officer to the Contract Appeals Board. *See* Contract at 8 ("all disputes concerning questions arising under this contract shall be decided by the contracting officer subject to written appeal by the contractor within thirty (30) days to the Contract Appeals Board....").

The contracting officer denied the claim in 1970 and the Contract Appeals Board affirmed the decision in 1972. Langenfelder then brought suit in the United States District Court for breach of contract and asserted that the Board had improperly denied its claim. The District Court, in 1974, reversed the Board and held that the District had been responsible for some of the restrictions at Dyke Marsh and remanded the case to the Board to determine what damages, if any, Langenfelder had incurred. *C.J. Langenfelder & Son, Inc. v. District of Columbia,* Civ. No. 2109–72 (D.D.C.Sept. 10, 1974).

In 1975, Langenfelder filed a new claim with the contracting officer seeking interest on whatever sums the Contract Appeals Board ultimately found to be due Langenfelder. The Contract Appeals Board denied Langenfelder's claim for interest and the Superior Court reversed the Board's decision. The resolution of this issue constitutes the focus of this opinion.

3. Various terms have been used by the parties and the Board to describe exactly what is at issue. Langenfelder asserts that use of the word "interest" constitutes an "over-simplification" of "the concept at issue." It prefers the phrase "the equitable adjustment cost of financing" in order to emphasize "that what is involved here is a

*cost* to the contractor of performing additional work directed by the government, not originally contemplated in the contractor's bid on the project." Reply Brief at 4–5. The Board referred to Langenfelder's claim as one for "general interest," and the District simply refers to "interest." The Superior Court refers to "the cost of the interest [Langenfelder] had to pay because of having had to borrow money to perform the additional work...." *C.J. Langenfelder & Son, Inc. v. District of Columbia,* Civ. No. 11747–79 at 3 (D.C.Super.Ct. June 16, 1987).

While acknowledging the nuances implied by the various characterizations of the issue, we prefer to use the term "interest" to describe the cost incurred by Langenfelder for expending $320,877.27 to perform changes in 1969–70 pursuant to the changes clause in the contract, but not remitted to Langenfelder until June 19, 1980.

4. Langenfelder also argues in its cross-appeal that it is owed prejudgment interest between June 19, 1980 and June 16, 1987, the latter date representing the day when the Superior Court entered its judgment in favor of the first interest claim. Because we reject Langenfelder's first interest claim, we do not reach the prejudgment interest issue.

5. February 19, 1969 represented the day on which excavation of the highway project requiring the use of Dyke Marsh began. Use of Dyke Marsh continued until May 19, 1970, when Langenfelder decided against further use of Dyke Marsh for its disposal operations. The Board determined that for this period of time Langenfelder was entitled to reimbursement for various costs for delay, the disposal site investigation, the additional costs at the disposal sites, special insurance, taxes and the cost of operating capital.

felder was "not entitled to payment on its claim for general interest" as part of the cost of the equitable adjustment for interest accrued beyond the time of Langenfelder's actual performance under the contract.

On September 12, 1979, the contractor filed a complaint for breach of contract in Superior Court challenging the Board's denial for reimbursement for interest incurred on financing after May 19, 1970. Both parties filed motions for summary judgment. The contractor argued that it was entitled to interest on the $320,887.27 measured at the prime interest rate, 7.75%, from September 28, 1975, to June 19, 1980. The parties had stipulated that if the court found the contractor was entitled to recover financing costs, the applicable computation period would be from September 28, 1975, the date the contracting officer first became aware of the claim for interest, to June 19, 1980, the date when the District paid Langenfelder the $320,887.27. Further, the parties stipulated that the prime rate of interest applied to that sum would amount to $144,990.12. The District, conceding only that it owed Langenfelder the $320,887.27, argued that if Langenfelder was entitled to such interest costs, the applicable rate was 6% as required under D.C.Code § 28–3302(a) (1988 Supp.).[6]

The Superior Court held that the Contract Appeals Board erred in denying Langenfelder interest for the period up to June 19, 1980, and entered summary judgment for Langenfelder. The court implied that such a result was mandated by "equity" as well as "the terms of the instant contract" pursuant to the equitable adjustment clause, whether the cost of performance was financed by borrowings from the contractor's bank or whether the contractor utilized its own funds for that purpose. Specifically, the court stated, "[Langenfelder] is entitled to an equitable adjustment of its contract price in an amount that will compensate it for the cost of the interest it had to pay because of having had to borrow money to perform the additional

work...." *C.J. Langenfelder & Son, Inc., supra,* Civ. No. 11747–79 at 2–3. Thus, the court found that plaintiff's payment of interest "represents a cost to plaintiff." *Id.* at 3 (citing *Maryland Port Administration v. C.J. Langenfelder & Son, Inc.,* 50 Md.App. 525, 438 A.2d 1374 (Ct.Spec.App. 1982)). The court also noted, however, that:

> Even if plaintiff had utilized its own assets to perform additional work required of it by the defendant, the Court is of the opinion that plaintiff would have been entitled to an equitable adjustment of its contract price to compensate it for such use.

*Id.* at n. 3.

Finally, the court concluded as part of its holding on this issue that since the Board "utilized the prime rate charged by [Langenfelder's] lender during the time of the actual performance of the additional work" during 1969 and 1970 to compute the amount of interest owed, it too would apply the prime rate to Langenfelder's claim for interest up to June 19, 1980. *Id.* at 3.

## II

Stated simply, the question before this court is whether an "equitable adjustment," as that contract term was used in 1968, was meant to include payment of interest as a cost incurred under the contract. Langenfelder argues that the term "equitable adjustment" implies an equitable, make-whole remedy that includes not only the cost of financing the actual changes in 1969–70 which amounted to $320,887.27, but also payment of interest on that sum which was not paid to Langenfelder by the District until 1980. Langenfelder relies heavily on two cases, the first of which was also relied upon in the Superior Court: *Maryland Port Administration, supra,* 438 A.2d 1374, and *General Railway Signal Co. v. Washington Metropolitan Area Transit Authority,* 875 F.2d 320, (D.C.Cir.1989). The District asserts that

6. D.C.Code § 28–3302(a) (1988 Supp.) states:
 The rate of interest in the District upon the loan or forbearance of money, goods, or

things in action in the absence of expressed contract, is 6 percent per annum.

while these cases perhaps represent a correct statement of the law in the late 1970s and 1980s, they are inapposite to an interpretation of the 1968 contract at issue in this case. We agree with the latter and hold that the terms of the contract never encompassed payment for the claimed interest here at issue as part of an equitable adjustment.

We further reject the proposition that equity guides our resolution of this case.

As a preliminary matter, we note that the dispute between Langenfelder and the District arises under the contract and is not in the nature of a breach of contract. "When the contract makes provision for equitable adjustment of particular claims, such claims may be regarded as converted from breach of contract claims to claims for relief under the contract." *Utah Construction, supra,* 384 U.S. at 404 n. 6, 86 S.Ct. at 1551 n. 6 (citations omitted); *see also Crown Coat Front Co. v. United States,* 386 U.S. 503, 511, 87 S.Ct. 1177, 1182, 18 L.Ed.2d 256 (1967); *District of Columbia v. Savoy Construction Co.,* 515 A.2d 698, 701–02 (D.C.1986). In cases arising under the contract, the contract itself governs the method and scope of relief available. *Crown Coat, supra,* 386 U.S. at 511, 87 S.Ct. at 1182.

It is a fundamental principle that "[t]he first step in contract interpretation is determining what a reasonable person in the position of the parties would have thought the disputed language meant." *Intercounty Construction Corp. v. District of Columbia,* 443 A.2d 29, 32 (D.C. 1982) (citations omitted). A presumption exists that the parties are aware of the surrounding circumstances at the time the contract was made. *See 1010 Potomac Assocs. v. Grocery Mfrs.,* 485 A.2d 199, 205 (D.C.1984); *Intercounty Construction Corp., supra,* 443 A.2d at 32; Restatement (Second) of Contracts § 202 (1981). Further, the parties are "bound by all usages which either party knows or has reason to know." *Intercounty Construction Corp., supra,* 443 A.2d at 32.

To determine the surrounding circumstances and common usage of a partic-

ular contract provision, courts must look to administrative and judicial interpretations of the contract provision at the time when the contract was executed. The meaning of a provision is fixed if there has been "uniform, continuous, and long-standing judicial and administrative construction" of its terms. *Utah Construction, supra,* 384 U.S. at 404–05, 86 S.Ct. at 1551–52. *See generally* 17 C.J.S. *Contracts* § 22 (1963 & 1988 Supp.) ("a contract will be construed according to the law of the state, as interpreted by its courts, at the time the contract was made, and not in accordance with subsequent decisions to the contrary.") Thus, in *Utah Construction,* the Supreme Court refused the government's request to alter a long-standing judicial and administrative construction of the disputes clause:

> But even if, as an original matter, the language of the disputes clause might have been susceptible of the interpretation urged by the Government, the restrictive meaning of the words "arising under this contract" had long since been established when these parties used them in 1953. *The question before us is what the parties intended, not whether the construction on which they relied was erroneous.*

384 U.S. at 407, 86 S.Ct. at 1553 (emphasis added).

In 1968, the District and Langenfelder executed their contract against a background of judicial and administrative interpretations which held that a contractor could not recover interest for delays in the resolution of contract disputes with the government. One author, in discussing the historical evolution of these decisions, characterized the rule as an "ancient doctrine." Walters, *The Matter of Interest in Federal Government Contracting,* 14 Pub. Cont. L.J. 96, 97 (Oct. 1983). Despite acknowledgments that equity might mandate a different outcome, the courts prior to 1968 steadfastly adhered to the rule that, in the absence of a statute or contractual provision to the contrary, interest was not recoverable on money owed by a sovereign. *See United States v. New York Rayon Importing Co.,* 329 U.S. 654, 659–60, 67 S.Ct. 601,

603–04, 91 L.Ed. 577 (1947); *United States v. North American Transp. & Trading Co.*, 253 U.S. 330, 336, 40 S.Ct. 518, 521, 64 L.Ed. 935 (1920); *Tillson v. United States*, 100 U.S. 43, 46, 25 L.Ed. 543 (1879); *Acme Process Equip. Co. v. United States*, 171 Ct.Cl. 324, 347 F.2d 509, 537 (1965), *rev'd on other grounds*, 385 U.S. 138, 87 S.Ct. 350, 17 L.Ed.2d 249 (1966); *Komatsu Mfg. v. United States*, 132 Ct.Cl. 314, 131 F.Supp. 949, 950 (1955); *Ramsey v. United States*, 121 Ct.Cl. 426, 101 F.Supp. 353, 356 (1951).

The District concedes, as it must, that the federal decisions are not directly controlling since they are based at least in part on the common law and statutory prohibition of the allowance of interest against the United States. *See* 28 U.S.C. § 2516(a) (1982). *Compare Maryland Port Administration, supra*, 438 A.2d at 1383. The courts in this jurisdiction and the Contract Appeals Board, however, have consistently applied federal contract provisions to District contracts. *See, e.g., Savoy Construction Co., supra*, 515 A.2d at 701 n. 3; *District of Columbia v. Heman Ward, Inc.*, 261 A.2d 836, 837–38 & nn. 1, 2 (D.C. 1970). Further, the Contract Appeals Board, whose cases supply authoritative construction of the equitable adjustment provisions of the District's contracts,[7] has routinely followed the rule disallowing interest as part of an equitable adjustment. For example, in *Community Residential Centers, Inc.*, CAB No. 478, Aug. 24, 1979, *aff'd sub nom. Community Residential Centers, Inc. v. District of Columbia*, No. 138–80 (Sup.Ct. July 1, 1981), *aff'd by Memorandum Opinion and Judgment*, No. 81–1055 (D.C. July 14, 1982), the Board stated:

> Contract Appeals Boards have consistently held that absent a specific contractual provision providing for interest payments, the Boards have no jurisdiction to allow such a claim. "It is well established that Boards of Contract Appeals may only grant that relief which is provided by the terms of the contract." *Ap-*

*peal of L.A. Mann and Sons Construction, Inc.*, GSBCA No. 4542, 76–2 BCA ¶ 12,087 (1976). Furthermore, the Board is not authorized to allow interest in the absence of such a provision because such action would constitute an improper reformation of the contract. "Since such clause was not included in the Appellant's contract, there is, therefore, no basis for the Board to act and grant or consider interest since the Board does not have authority to reform the contract." *Appeal of E. Lionel Pavlo*, GSBCA No. 39391–R, 74–2 BCA ¶ 10,765 (1974). *See also Appeal of T.M. Industries*, ASBCA No. 20676, 76–1 BCA ¶ 11,833 (1976); *Appeal of Fruehauf Corporation*, PSBCA No. 197, 76–1 BCA ¶ 11,771 (1976), "... the fact remains that such interest consistently has been held unallowable, absent a statute or contract clause, before Boards of Contract Appeals, to the point where the legal writers consider the cases legion."

*Community Residential Centers*, at 23–24; *see also George Hyman Construction Co.*, 30 D.C.Reg. 4565, 4585 (1983); *Clayton Mfg.*, 31 D.C.Reg. 1606, 1618–19 (1984). The rule was so engrained in the law of this jurisdiction that the D.C. Circuit noted that as of 1974, "not a single court or board of contract appeals had allowed recovery of interest foregone on equity capital as a 'cost of performance.'" *George Hyman Construction Co. v. Washington Metropolitan Area Transit Authority*, 259 U.S. App.D.C. 449, 456, 816 F.2d 753, 760 (1987). This rule of construction was consistently applied by the Court of Claims and the Contract Appeals Board in the 1970s, when despite changes in the statutory law governing the payment of interest, most notably in the Contracts Disputes Act, *see infra* note 10, these tribunals refused to give retroactive effect to changes in the law. *See, e.g., Brookfield Construction Co. v. United States*, 228 Ct.Cl. 551, 661 F.2d 159, 163 (1981); *Lawrence D. Krause*, AGBCA No. 76–118–4, 82–2 BCA

---

7. *See generally Le Jimmy, Inc. v. District of Columbia Alcoholic Beverage Control Bd.*, 433 A.2d 1090, 1092 (D.C.1981) (not within province of court to substitute its own judgment for that of agency).

¶ 16,129 (1982) (holding that although federal procurement regulations were amended on July 28, 1972, to require inclusion of standard clause for payment of interest, "such regulations did not apply retroactively to [the] contract which was awarded on May 2, 1972."); *J.R. Erickson*, AGBCA, No. 333, 76–1 BCA ¶ 11,716 (1976).

Langenfelder ignores the vast body of law which firmly establishes that interest was not allowable as an element of compensation under the equitable adjustment provisions of the contract. The contractor's emphasis on *Kenny Construction Co. v. District of Columbia*, 105 U.S. App.D.C. 8, 262 F.2d 926 (1959), to support its claim that interest was recoverable on District contracts despite federal precedent to the contrary, is misplaced. In *Kenny Construction*, the contractor and the District had entered into a contract which provided that monthly partial payments were to be made to the contractor as the work progressed with a 10% retainage until the work was completed by the contractor and accepted by the District. *Id.* 262 F.2d at 927. The District withheld payment at the end of the project alleging that the work had not been fully performed. *Id.* The D.C. Circuit held that the contractor could recover interest on that portion of the sum of money retained which exceeded the agreed upon 10% retainage. *Id.* at 930. The action in *Kenny Construction* was based on a breach of contract and was not an action arising under the contract, as is true in the present case, and therefore cannot be invoked in Langenfelder's behalf.

An exception to the no-interest rule was established by the Court of Claims in 1968. In *Bell v. United States*, 186 Ct.Cl. 189, 404 F.2d 975 (1968), the court held that where a contractor could show that it paid interest on borrowings necessitated to perform changes pursuant to the changes clause of a contract, the contractor could recover the cost of such interest as part of the equitable adjustment under the contract. The court reasoned that this sort of interest payment was a cost of performance resulting from a government ordered change. The Court of Claims has consistently maintained this distinction between reimbursement of costs which could be traced directly to a loan obtained to perform changes ordered by the contracting officer and opportunity costs lost as a result of delays in payment. The former costs were deemed compensable, but the latter costs were not true performance costs lost as a result of delays in payment and thus were not compensable.[8] *See Dravo Corp. v. United States*, 219 Ct.Cl. 416, 594 F.2d 842, 849 (1979) (finding that "'clear necessity for borrowings occasioned by the change' must be proven by the contractor"); *Framlau Corp. v. United States*, 215 Ct.Cl. 185, 568 F.2d 687, 694 (1977) (affirming Board's decision to disallow interest where contractor failed to show what portion of claim was due to finance contract changes); *Singer Co. v. United States*, 215 Ct.Cl. 281, 568 F.2d 695, 718–20 (1977) (denying interest allowance where necessity for borrowing was not proven).

A finding that Langenfelder was paying interest between 1975 and 1980 on loans undertaken to finance the changes at Dyke Marsh in 1969 and 1970 was never made by the Contract Appeals Board, nor does such evidence exist in the record. Indeed, Langenfelder does not argue that it was in fact paying interest on such loans between 1975 to 1980. Rather, the thrust of Langenfelder's argument seems to be that it was entitled to interest because it was deprived of the use of its money while the contract disputes mechanism ran its course.[9] Thus,

8. *Bell* was decided on December 13, 1968. *Supra*, 404 F.2d at 975. The contract in this case was executed on December 16, 1968.

9. In its Reply Brief, Langenfelder also advances two other arguments as to why it should not have to show that it made interest payments between 1975 and 1980. First, Langenfelder asserts that the fact that the parties stipulated the time period when the interest award, if any, would be computed, excuses it from the burden of showing actual interest payments over the time period in question. This argument is without merit. Second, Langenfelder argues that the issue of borrowing was not raised below. This argument too is without merit since Langenfelder should not be able to benefit from its failure to present evidence of interest payments. Had such evidence been presented, the Board

the exception developed in *Bell* and its progeny does not apply.

 The trial court in reviewing Contract Appeals Board decisions acts merely as a reviewing court and must sustain the findings of the Board if they are based on substantial evidence in the administrative record:

> Even when the contractual scheme has run its course and the contractor is free to file his suit in court, he is not entitled to demand a *de novo* determination of his claim for an equitable adjustment. The evidence in support of his case must have been presented administratively and the record there made will be the record before the reviewing court. *United States v. Carlo Bianchi and Co.*, 373 U.S. 709 [83 S.Ct. 1409, 10 L.Ed.2d 652 (1963)]; *United States v. Utah Construction Co.*, 384 U.S. 394 [86 S.Ct. 1545, 16 L.Ed.2d 642 (1966)]. The court performs principally a reviewing function. Only if it is alleged and proved that the administrative determination was arbitrary, capricious or not supported by substantial evidence may the court refuse to honor it.

*Crown Coat, supra,* 386 U.S. at 512–13, 87 S.Ct. at 1182–83. The trial court in this case, however, went beyond the evidence presented to the Board and made the finding that Langenfelder made interest payments on its loans. Specifically, the court stated:

> In order to perform the additional work necessitated by defendant's actions, plaintiff was required to borrow money ... plaintiff is entitled to an equitable adjustment of its contract price in an amount that will compensate it for the cost of the interest it had to pay because of having had to borrow money to per-

form the additional work required of plaintiff by defendant pursuant to the provisions of the contract.

*C.J. Langenfelder & Son, Inc., supra,* Civ. No. 11747–79, at 1–2. This finding is simply not supported by evidence in the record. The trial court's assumption on summary judgment that Langenfelder was paying interest between 1975 and 1980 was inappropriate.

Langenfelder also emphasizes the inequity of the rule, an argument that appeared to sway the trial court as it found for Langenfelder not only under the terms of the contract, but also in equity, the court opining that "[e]quity, as in 'equitable' adjustment, requires as much...." *Id.* at 3. To support its conclusions the trial court relied on *Maryland Port Administration, supra,* where the Maryland Court of Special Appeals, looking to federal case law, determined that interest was a cost of performance that could be recovered as part of an equitable adjustment. 438 A.2d at 1383–84.

*Maryland Port Administration,* however, is different in critical aspects from the present case. The contract at issue in that case was executed in 1978. By that time, the law regarding the recovery of interest for delays in payment by the government had begun to change. As noted by the court, the Defense Department changed its procurement procedures in 1976 to allow for predecision interest without regard to borrowing on the part of the contractor. *Id.* at 1383 (citing 32 C.F.R. § 7–104.82 (1979)). Then in 1978, Congress passed the Contracts Disputes Act of 1978, 41 U.S.C. § 601 *et seq.* (1982),[10] which removed the former federal bar against claims for interest against the government. The Maryland court acknowledged that the

---

would have been required to apply the law as it had developed as of the date of the contract regarding the payment of interest on borrowings to finance contract modification.

**10.** The Contract Disputes Act of 1978 provides for interest payments to contractors:

> Interest on amounts found due contractors on claims shall be paid to the contractor from the date the contracting officer receives the claim pursuant to Section 605(a) of this title

from the contractor until payment thereof. The interest provided for in this section shall be paid at the rate established by the Secretary of the Treasury pursuant to Public Law 92–41 (85 Stat. 97) for the Renegotiation Board.

41 U.S.C. § 611 (1982). *See generally* Walters, *supra,* 14 Pub.Cont.L.J. at 111–19 (discussing interest under the Contracts Disputes Act).

concept of "equitable adjustment" was new to Maryland and characterized the concept as one "intended to 'keep a contractor whole.'" *Maryland Port Administration, supra,* 438 A.2d at 1382–83 (citing *Bruce Construction Corp. v. United States,* 163 Ct.Cl. 97, 324 F.2d 516, 518 (1963)). What the Maryland court did, in essence, was to apply mid–1970 federal contract law to interpret a clause in a mid–1970 contract. This is entirely consistent with what we have done herein—applying 1968 contract law to a 1968 contract interpretation.

■ Further, for the reasons we have explicated above, we find inappropriate the analysis set forth by the D.C. Circuit and relied upon by Langenfelder in *General Railway Signal Co. v. Washington Metropolitan Area Transit Authority,* where the court, construing a changes clause in a 1971 contract with almost identical language to the one at issue in the present case, stated:

> The "Changes" clause of that contract, as we have seen, authorizes "equitable adjustments" in cases like this. This term imports into the contract a doctrine mandating a make-whole remedy that will restore a contractor to the contractor's pre-change circumstances. Courts have long recognized that restoration of a party to the *status quo ante* typically requires compensation for prejudgment interest, since it is an actual element of the costs incurred by virtue of the other parties, conduct. *See Maryland Port Administration v. C.J. Langenfelder & Son, Inc.* [50 Md.App. 525], 438 A.2d 1374 (Ct.Spec.App.1982); *see also Bebchick v. Washington Metropolitan Area Transit Commission* [207 U.S.App.D.C. 161], 645 F.2d 1086, 1093 (D.C.Cir.1981).

875 F.2d 320 at 327 (D.C.Cir.1989). We reject the perhaps linguistically-enticing, yet facile analysis relied upon in *General Railway* and the cases cited therein that "equitable adjustment" and "equity" are interchangeable concepts authorizing this court with roving discretion to reform the contracts of informed and sophisticated parties. *See Maryland Port Administra-*

*tion, supra,* 438 A.2d at 1383; *Bebchick v. Washington Metropolitan Area Transit Commission,* 207 U.S. App.D.C. 161, 168, 645 F.2d 1086, 1093 (1981) (allowing interest in "equitable proceeding" for restitution).

This is not an equitable action; it is an action arising under the contract. Equitable considerations have no bearing upon the validity of the Board's determination. While the Maryland court in *Maryland Port Administration, supra,* 438 A.2d at 1382, wrote on a clean slate, "the concept of equitable adjustment [being] relatively new to Maryland," this court does not. When Langenfelder and the District executed their contract the Contract Disputes Act was nothing more than an idea awaiting legislative birth. In the meantime, courts and administrative tribunals consistently construed interest claims against the contractor. Try as it might, Langenfelder cannot claim the benefit of an albeit enlightened 1978 legislative change and the resulting judicial interpretations for construction of its 1968 contract.

*Reversed.*

SCHWELB, Associate Judge, dissenting:

"Try as they might," my colleagues cannot persuasively contend that where the parties agreed that an "equitable adjustment" would be made, they intended "equitable considerations [to] have no bearing" on the proper construction of the contract and meant, instead, that "if I change my mind and it costs you, you pay the freight." By reading the word "equitable" out of the "equitable adjustment" clause, the majority might as well be saying that the wedding was a success when everybody attended except the bride and groom. Believing that courts have no "roving discretion" to construe agreements by informed and sophisticated parties contrary to their terms, or to ignore both established doctrines of contract law and dispositive differences between the authorities relied on by the District and the present case, I respectfully dissent.

I agree with the majority that this controversy turns on what the parties intended in 1968,[1] and that subsequent changes in federal law are irrelevant. My differences with my colleagues concern their analysis of what *these* parties—Langenfelder and the District of Columbia—meant when they used the term "equitable adjustment." Specifically, I disagree with the majority's assumption that these words as used in the present agreement must mean the same thing as similar language in federal contracts. Any restrictive judicial gloss placed on "equitable adjustment" in the federal context was predicated on the existence of constitutional and statutory provisions exempting the United States from the obligation to pay interest. Since it is conceded that no such exemption existed in 1968 (or exists now) for the District of Columbia, reasonable people would have believed at that time that the words "equitable adjustment" meant what they said, and that their artificially narrow construction, designed to comport with principles peculiarly applicable to contracts with the federal government, should not be carried over to the agreement between Langenfelder and the District.

I

The principal facts are not in dispute and are relatively straightforward. The contract between the parties, executed in 1968, provides that the contracting officer may change specifications without prior notice, but that if he does so, and if this causes an "increase in the cost of performing the work," then an equitable adjustment will be made. It is undisputed that Langenfelder has agreed to convert what would otherwise be a claim for breach of contract into a claim under the contract for equitable adjustment. *See Crown Coat Front Co. v. United States,* 386 U.S. 503, 511, 87 S.Ct. 1177, 1182, 18 L.Ed.2d 256 (1967). In 1974, the United States District Court for the District of Columbia held that certain restrictions imposed by the District on Langenfelder's use of a site for disposition of

waste material constituted a change warranting an equitable adjustment. In September 1975, on remand from that court, the Contract Appeals Board held that the District owed Langenfelder $320,877.27 as the cost of performing the additional work. The amount awarded was not paid until June 1980, however, and Langenfelder argues that it is entitled to interest on that amount for the period of almost five years between award and payment. For reasons described in the majority opinion, the District contends otherwise.

II

Government contracts have their own peculiarities, but they are contracts nevertheless. "The same rules invoked in the construction of contracts between private individuals and corporations are generally applicable in the construction of municipal contracts." 10 E. McQuillin, The Law Of Municipal Corporations § 29.116, at 527 (3d ed. 1981). The first step in interpreting an agreement between the government and a contractor is to determine what reasonable persons in the position of the parties would have thought the disputed language meant. *Intercounty Constr. Corp. v. District of Columbia,* 443 A.2d 29, 32 (D.C. 1982). A reasonable person is presumed to know all of the circumstances surrounding the making of the contract, and is bound by all the usages which either party knows or has reason to know. *Id.*

The court must look to the intent of the parties in entering the agreement but, if that intention cannot be conclusively determined without resort to secondary rules of construction, then "the ambiguities remaining in the contract will be construed strongly against the drafter." *Id.; see also C.J. Langenfelder & Son, Inc. v. United States,* 169 Ct.Cl. 465, 481, 341 F.2d 600, 610 (1965) ("if it be assumed that this government-drawn specification is ambiguous, it must be construed against its drafter"). As the Supreme Court put it almost a century before this contract was exe-

---

1. Fact-finding is not, of course, an appellate function. Here, however, what these parties intended is basically a function of what the

phrase "equitable adjustment" meant in the District in 1968. This is primarily a question of law. *See* p. 1168, *infra.*

cuted, "a party who takes an agreement prepared by another, and upon its faith incurs obligations or parts with his property, should have a construction given to the instrument favorable to him." *Noonan v. Bradley*, 76 U.S. (9 Wall.) 394, 407, 19 L.Ed. 757 (1869).

Although my colleagues chide Langenfelder for suggesting that equitable considerations should intrude upon an action arising under the contract, resort to such matters is not proscribed where the language of the contract is less than plain. A contract will not be construed so as to render it oppressive or inequitable as to either party, or so as to place one of the parties at the mercy of the other, unless it is clear that such was their intention at the time the agreement was made. *Woods v. Postal Telegraph–Cable Co.*, 205 Ala. 236, 239–40, 87 So. 681, 684, 27 A.L.R. 834, 839 (1920); 17 Am.Jur.2d *Contracts* § 252 (1964) and authorities cited at 644 n. 10. Justice Chase's words in *Noonan, supra*, have the ring of conviction and the force of truth:

> when an instrument is susceptible of two constructions—the one working injustice and the other consistent with the right of the case—that one should be favored which standeth with the right.

76 U.S. at 407. This principle applies with particular force where, as here, the parties have agreed to an *equitable* adjustment in a form contract utilized by the District.

The District contends that by 1968, equitable adjustment was a term of art. I cannot disagree. In 1963, five years before the present contract was executed, the Court of Claims explained that equitable adjustments "are simply corrective measures utilized to keep a contractor whole when the Government modifies a contract." *Bruce Constr. Corp. v. United States*, 163 Ct.Cl. 97, 100, 324 F.2d 516, 518 (1963). The purpose of such adjustments is "to safeguard the contractor against increased costs engendered by the modification." *Id.* The amount of the adjustment is deter-

mined in the light of the particular contractor's costs. *Id.*

The proper measure of an equitable adjustment is the difference between what it would have cost to perform the work as originally required and what it actually cost to do so in light of the change. *General Railway Signal Co. v. Washington Metropolitan Area Transit Auth.*, —— U.S.App.D.C. ——, ———— ——, 875 F.2d 320, 324–325 (1989). Except where sovereign immunity or statutory law proscribes it, interest is an integral part of the "make whole" remedy represented by the equitable adjustment provision. *Id.* at 327–328. As the court explained in *Maryland Port Admin. v. C.J. Langenfelder & Son, Inc.*, 50 Md.App. 525, 542–43, 438 A.2d 1374, 1384 (1982),

> there can be no equitable adjustment until the contractor recovers the entire cost of doing the extra work, and the cost of money to finance that additional work is a legitimate cost of the work itself. That is true whether the cost of the money is in the form of interest paid on borrowed funds or the loss of income on the contractor's own capital invested in the additional work. We therefore think that compensation for such a cost—the cost of money—is an appropriate element in calculating an "equitable adjustment," and that the allowance of that cost may be expressed in the form of predecision interest.

In light of these authorities, I think it beyond reasonable dispute that, but for the gloss said to have been placed on the present contract by federal decisional law prior to 1968, interest would be recoverable. When the parties used the phrase equitable adjustment, they did not mean that the adjustment should be inequitable. "Equitable" has variously been defined, in its primary sense, as "characterized by equity; fair to all concerned," [2] as "possessing or exhibiting equity; according to natural right or justice," [3] and as "just; conformable to the principles of justice and

---

2. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1966).

3. WEBSTER'S SECOND NEW INTERNATIONAL DICTIONARY (1945).

**1166**

right." [4] Under any of these definitions, it is equitable to compensate a contractor, who is required to borrow or advance money as a result of the government's unilateral changes, for the cost of borrowing that money (interest paid) or of advancing it (interest foregone). Accordingly, unless the contract was negotiated under circumstances that require us to interpret it contrary to its literal meaning, I do not see how Langenfelder's right to interest can be plausibly denied.[5]

### III

This is all very well, says the District, but the contract does not mean what it seems so plainly to say, and an equitable adjustment, as the term is used here, has nothing to do with equity. The District argues, and the majority holds, that a contextual gloss was placed on the phrase by years of consistent practice. The District relies in particular on *Bell v. United States*, 186 Ct.Cl. 189, 404 F.2d 975 (1968) (*per curiam*), a case decided eleven days after the Langenfelder contract was executed, as establishing that equitable adjustment did not then include interest on equity capital.

In *Bell*, the Court of Claims held, contrary to the government's argument, that interest was recoverable under an equitable adjustment clause where the contractor had paid interest on money borrowed to finance a change order which had been imposed by the contracting officer. Noting that 28 U.S.C. § 2516(a) (1964) authorizes the Court of Claims to award interest on a claim against the United States "only under a contract or Act of Congress expressly providing for payment thereof," the court held that the statute did not preclude the contractor from recovery of interest in the case before it. This was so,

the court explained, because the statute and its policy

> apply to demands for damages in "breach" claims against the United States where the plaintiff seeks compensation for delay in payment. The demand here is not based upon a "breach" but upon a change compensable under the "Changes" article which entitles the contractor to the resulting "increase * * * in the cost of performance of this contract."

*Id.* at 205–06, 404 F.2d at 984. The court did not address a question not before it—whether foregone interest on the contractor's own capital would be recoverable where the claim was advanced under the equitable adjustment clause rather than for breach of contract. Subsequently, the court held in *Framlau Corp. v. United States*, 215 Ct.Cl. 185, 197–98, 568 F.2d 687, 694 (1977)—decided nine years after the present contract was executed—that interest on equity capital is not recoverable under an equitable adjustment clause, and that the contractor may not recover such interest unless he establishes that the loan was specifically secured to finance the contract change. Other cases to the same effect are cited in the majority opinion at pp. 1161–1162.

The lesson of *Bell* and its progeny is that interest is not recoverable under an equitable adjustment clause to the extent that an award would contravene 28 U.S.C. § 2516(a) or related notions of sovereign immunity. At pp. 1159–1160 of its opinion, the majority cites a series of federal cases decided prior to 1968 for the proposition that, absent a statute or contractual provision to the contrary, interest was not recoverable on money owed by the United States.[6] Each one of these decisions, how-

**4.** BLACK'S LAW DICTIONARY (5th ed. 1979).

**5.** Langenfelder, which has apparently done billions of dollars of business with various governmental bodies, is hardly the proverbial widow or orphan who requires the protection of the courts from one-sided agreements imposed by exploitive adversaries. Nevertheless, an interpretation of the agreement which allows the government to make as many unilateral changes as it wishes and requires the contractor

to borrow or advance the necessary funds for lengthy periods without receiving interest would place the contractor, to that extent, at the mercy or caprice of the government.

**6.** *See United States v. New York Rayon Importing Co.*, 329 U.S. 654, 659–60, 67 S.Ct. 601, 603–04, 91 L.Ed. 577 (1947); *United States v. North Am. Transportation & Trading Co.*, 253 U.S. 330, 336, 40 S.Ct. 518, 521, 64 L.Ed. 935 (1920); *Tillson v. United States*, 100 U.S. 43, 46,

ever, is expressly predicated on 28 U.S.C. § 2516 or on one of its precedessor statutes. In *New York Rayon Importing Co.*, cited in note 6, *supra*, for example, the first of the cases to which the majority alludes, the Court explained that even

assuming that the equities of the situation all favor the owners of the refund claims, the Court of Claims did not thereby acquire power to carve out an implied exception to the plain words of [the statute].

329 U.S. at 660, 67 S.Ct. at 604. These authorities instruct us that an immune sovereign will not be found to have bargained away its immunity unless it has made its intention to do so plain beyond peradventure.

The present case, however, is critically different from the federal decisions relied on, for we are not dealing with an immune sovereign. It is not true in the applicable jurisprudence of this fair city that the king can do no wrong. As stated in a memorandum filed in support of its motion for summary judgment in this case,

[t]he District of Columbia does not contend that an award of interest against it is barred by the doctrine of sovereign immunity.

Accordingly, as the majority notes, opinion p. 1160, the District concedes "as it must" that the federal decisions are "not directly controlling since they are based at least in part on the common law and statutory prohibition of the allowance of interest against the United States."

The difference between federal and district law in this arcane area can be instructively assessed by a comparison of *Bell, supra,* with *Kenny Constr. Co. v. District of Columbia,* 105 U.S. App.D.C. 8, 262 F.2d 926 (1959). In *Bell,* as I have noted, the court explained that considerations of sovereign immunity would bar recovery of interest where the contractor sought damages against the United States for breach of contract. In *Kenny Constr. Co.,* on the

other hand, the court held that a contractor was entitled to recover interest as part of the remedy in a claim for breach of contract where the District had withheld more of its payment than it was permitted to withhold under the terms of its contract. *Id.* at 11–12, 262 F.2d 929–30.

Given the decisive role played by constitutional and statutory principles of sovereign immunity in the interpretation of federal contracts, and the inapplicability of these principles to District of Columbia instruments, I suggest that well-informed negotiators for the District and Langenfelder in 1968 would have recognized that the same words would not necessarily mean the same thing in the two different contexts. *See Maryland Port Admin., supra,* 50 Md.App. at 542–43, 438 A.2d at 1384 (meaning of equitable adjustment in Maryland different from its meaning in federal cases, since sovereign immunity considerations do not apply).

## IV

The District argues, however, that regardless of any differences between federal and District law with respect to sovereign immunity, the courts in this jurisdiction have applied federal contract principles to District contracts, and that we should do so here. According to the District, the Board of Contract Appeals has applied federal precedents to deny claims for interest under an equitable adjustment clause, and has done so without making any distinction relating to the role of sovereign immunity in the two jurisdictions. The District relies primarily on *Community Residential Centers, Inc.,* C.A.B. No. 478, Aug. 24, 1979, *aff'd sub nom. Community Residential Centers, Inc. v. District of Columbia,* No. 138–80 (Super.Ct.D.C.1981), *aff'd mem.* No. 81–1055 (D.C.1982), quoted in the majority opinion at p. 1160. This contention does not withstand analysis.

25 L.Ed. 543 (1879); *Acme Process Equip. Co. v. United States,* 171 Ct.Cl. 324, 347 F.2d 509, 537 (1965), *rev'd on other grounds,* 385 U.S. 138, 87 S.Ct. 350, 17 L.Ed.2d 249 (1966); *Komatsu Mfg. Co., Ltd. v. United States,* 132 Ct.Cl. 314, 131

F.Supp. 949, 950 (1955); *Ramsey v. United States,* 121 Ct.Cl. 426, 101 F.Supp. 353, 356 (1951), *cert. denied,* 343 U.S. 977, 72 S.Ct. 1072, 96 L.Ed. 1369 (1952).

It is true that this court has relied upon federal precedents construing statutory or contractual language identical or similar to that utilized in the District of Columbia. *See, e.g., District of Columbia v. Heman Ward, Inc.*, 261 A.2d 836, 837–38 (D.C. 1970), followed in *District of Columbia v. Savoy Constr. Co.*, 515 A.2d 698, 701 n. 3 (D.C.1986). The District has cited no authority, however, and I know of none, which would require us to follow that practice where, as in this case, the federal interpretation is based wholly or in substantial part on considerations—here notions of sovereign immunity—which have been conceded not to be applicable to the District of Columbia.

Notwithstanding the District's arguments about "longstanding judicial and administrative construction of the dispute clause" having cast a restrictive gloss on the meaning of "equitable adjustment," there had simply been no such District of Columbia construction in 1968. The District has cited no judicial decision construing the phrase in a District of Columbia contract. The District does cite "dictum" in a decision by the Board of Contract Appeals in 1957 to the effect that interest is not recoverable, *see Kenny Constr. Co.*, D.C.C.A.B. No. 21 (June 21, 1957), but concedes that the dictum has not been cited in subsequent Board decisions. This is hardly astonishing, since the United States Court of Appeals reversed the decision to which the District invites our attention. *Kenny Constr. Co. v. District of Columbia, supra.*

Although the quotation from *Community Residential Centers, Inc.*, on which the majority relies (opinion, p. 1160) appears at first blush to support the District's position, its significance is limited. The decision is dated August 24, 1979, more than a decade after the Langenfelder contract. The federal administrative rulings on which the Board there relied also came down five years or more after 1968. Obviously, unless the individuals who negotiated the Langenfelder contract had psychic powers or a crystal ball, they could not have based their interpretation of the contractual terms on any of these authorities. Moreover, the Board in *Community Residential Centers, Inc.* did not address the differences between federal and District of Columbia law in relation to sovereign immunity.[7]

At most, the District has shown that, as of 1968, the question of interest as part of an "equitable adjustment" had not been litigated in this jurisdiction. If this means that not many contractors had claimed it—and perhaps this is a fair reading—then this may conceivably create an ambiguity in a contract which on its face cries out for relief for Langenfelder. But even assuming, *arguendo*, that such an ambiguity was created, it must surely be resolved against the District pursuant to the principles of interpretation discussed at pp. 1164–1165, *supra.*

## V

The District also contends, and the majority holds, that the trial judge failed to accord sufficient deference to the decision of the Board of Contract Appeals. I cannot agree.

In *District of Columbia v. Heman Ward, Inc., supra*, this court, following the principles of the Wunderlich Act,[8] held that although the court must accept the Board's findings of fact if they were supported by substantial evidence, its decisions were not final as to questions of law. 261 A.2d at 838. Under *Heman Ward*, the judge is entitled to review for legal error.

In the present case, the issue before us concerns the meaning of a contract signed in 1968. Although the controversy raises the factual question of what the contracting parties then intended, their probable intent can only be discerned by determining the state of the law at the time of the contract or, more specifically, whether

---

7. "Questions which merely lurk in the record, neither brought to the attention of the [agency] nor ruled upon, are not to be considered as having been so decided as to constitute prece-

dents." *Webster v. Fall*, 266 U.S. 507, 511, 45 S.Ct. 148, 149, 69 L.Ed. 411 (1925).

8. 41 U.S.C. §§ 321, 322 (1987).

there had been a continuing course of construction which had narrowed the literal meaning of the words used by the parties. The Board itself made no germane factual findings and addressed the issue solely in a very brief Conclusion of Law. Although the point is not free from doubt, I agree with the Board that the result turns more on a determination of law than on the resolution of any meaningful question of fact.

The Board's Conclusion of Law No. 5 states, in its entirety, that

Appellant is not entitled to payment on its claim for general interest.

Some may prefer these twelve unambiguous words to this not so very concise dissent. Nevertheless, this is not the kind of detailed analysis by an administrative body which cries out for the court to defer to that body's assessment. I do not think that Judge Scott erred in not doing so.

## VI

In reaching its decision in this troubling case, the majority criticizes the reasoning of our colleagues across the street in *General Railway Signal Co., supra.* Although the majority attempts to distinguish the Maryland court's decision in *Maryland Port Admin.*, correctly noting that the contract which the court was there construing was written in 1978, by which time federal law had evolved, the approach of that court is obviously different from that of my colleagues. In fact, the District in its brief chides the Maryland court for failing to consider the "gloss" which, the District claims, has now become a part of the term "equitable adjustment." Any fair reader of the *General Railway Signal Co.*, and *Maryland Port Admin.* opinions would conclude, in my view, that those courts probably would not have decided the present case as the majority is deciding it.

I agree with my colleagues that judges have no roving commission to relieve sophisticated parties of their contractual obligations. I suggest, however, that before we revise the meaning of the words to which the parties have agreed, and before we reject as inapplicable accepted principles of contractual interpretation, all be-

cause of an imported "gloss," we had better be sure that the gloss belongs.

I respectfully dissent.